CITIZENS BANK OF WEIRTON

*v.*

WEST VIRGINIA BOARD OF BANKING AND FINANCIAL

INSTITUTIONS

(No. 13671)

Decided March 29, 1977.

*Bowles, Kauffelt, McDavid & Graff, David C. Hardesty, Jr.* for appellant.

*Chauncey H. Browning,* Attorney General, *James S. Arnold,* Deputy Attorney General, *Jon Anthony Reed,* Assistant Attorney General, for W. Va. Bd. of Banking and Financial Institutions.

*McCamic & McCamic and Jeremy C. McCamic* for Weirton Bank & Trust Co.

NEELY, JUSTICE:

This appeal squarely presents the question of the nature and extent of required findings of fact in administrative orders entered by state agencies under *W. Va. Code,* 29A-5-3 (1964), one of the sections within the chapter known as the "Administrative Procedures Act." The appellant alleges that the West Virginia Board of Banking and Financial Institutions failed to comply with *Code,* 29A-5-3 (1964) when it granted a general banking charter to appellee.

In April 1974, the appellee's predecessor, Weirton Savings & Loan Company, applied to the Appellee Board of Banking and Financial Institutions to change the name of the institution from Weirton Savings & Loan Company to Weirton Bank & Trust Company and to change the nature of the business from a savings and loan institution to a corporation with general banking powers. The record discloses that ownership of the proposed bank is identical to that of the Weirton Savings & Loan Company, and that the reorganization involved a one-for-one exchange of stock.

On April 25, 1973, appellant Citizens Bank of Weirton petitioned the Board to intervene as a party for the purpose of protesting Weirton Savings' application for

the banking charter. No other person or institution intervened in the proceeding. The appellant took an active part in the proceedings by filing papers, presenting evidence, and conducting the cross-examination of witnesses. After receipt of the appellee's application, the Board undertook an investigation of the case and prepared its own field investigation report which was filed with the Board in October 1974, and in November 1974 a hearing was held at which evidence was presented by all parties. On December 10, 1974 the Board, by order, granted appellee's application and on January 3, 1975, appellant appealed the Board's decision to the Circuit Court of Kanawha County pursuant to the provisions of *W. Va. Code*, 29A-5-4 (1964), and *W. Va. Code*, 31A-3-4 (1969). On May 29, 1975, the Circuit Court of Kanawha County affirmed the action of the Board. The Citizens Bank appealed to this Court, pursuant to *W. Va. Code*, 29A-6-1 (1964) and *W. Va. Code*, 31A-3-4 (1969).

The appellee raises the issue in this Court of whether the method employed by the appellant to initiate judicial review of the Board's order of December 10, 1974, was sufficient to grant the Circuit Court of Kanawha County jurisdiction in this case.

*W. Va. Code*, 29A-5-4 (1964) sets forth the procedure by which a petition for review of agency action can be instituted in the appropriate circuit court. Among other requirements, *W. Va. Code*, 29A-5-4 (1964) states that "A copy of the petition shall be served upon ... all other parties of record by registered or certified mail." Here the petition for review was served upon Jeremy C. McCamic, a member of the board of directors both of Weirton Savings and Loan Company and of the Weirton Bank & Trust Company. Inasmuch as both these corporations are domestic corporations, the notice provisions of *W. Va. Code*, 56-3-13 (1975), permitting service upon members of the boards of directors of such corporations, are applicable. Accordingly, service of the petition for review upon Jeremy C. McCamic was sufficient to bring Weirton Savings and Loan Company, or its successor Weirton Bank & Trust Company, before the Circuit

Court of Kanawha County for proceedings upon the petition for review of agency action.

## I.

The primary question presented on the merits is whether the Board's simple restatement in its order of the statutory language found in *W. Va. Code*, 31A-4-6 (1969) without more constituted sufficiently specific findings of fact to comply with *W. Va. Code*, 29A-5-3 (1964).[1] We think that they were not.

---

[1] *W. Va. Code*, 31A-4-6 (1969) enumerating the criteria for the issuance of a bank charter provides as follows:

(a) When an agreement of incorporation, fully complying with the requirements of this article, has been filed with the board, it shall promptly make or cause to be made a careful examination and investigation relative to the following:

(1) The character, reputation, financial standing and motives of the organizers, incorporators and subscribers in organizing the proposed bank;

(2) The need for the facilities and services which the proposed bank will offer in the community where it is to be located, giving particular consideration to the adequacy of existing banking and trust facilities and services;

(3) The present and future ability of the community to support the proposed bank and all other existing banking and trust facilities and services in the community;

(4) The character, financial responsibility, banking experience and business qualifications of the proposed officers; and

(5) The character, financial responsibility, business experience and standing of the proposed stockholders and directors.

(b) The board shall approve or disapprove the application, in the exercise of its reasonable discretion, but shall not approve such application unless it finds:

(1) Public convenience and advantage will be promoted by the establishment of the proposed bank;

(2) Local conditions assure reasonable promise of successful operation for the proposed bank and those banks already established in the community;

(3) The proposed capital structure is adequate;

(4) The proposed officers and directors have sufficient banking experience and trust experience (if the bank proposes to engage in the trust business), ability, character and standing to assure reasonable promise of successful operation;

(5) The name of the proposed bank or trust company is not so similar as to cause confusion with the name of an existing bank; and

The Board's final order in its entirety reads as follows:

WHEREAS the stockholders of the Weirton Savings & Loan Co., Weirton, West Virginia, having caused to be filed with the Board of Banking and Financial Institutions a proposed RESTATED CHARTER of said Weirton Savings & Loan Co., for the purpose of converting same to a commercial banking institution by name of Weirton Bank and Trust Co., said RESTATED CHARTER showing date of the 1st day of April, 1974; and

WHEREAS the Board having caused to be made a careful examination and investigation as required by statute; and

WHEREAS the Board having held a hearing in the prescribed manner on the 18th day of November, 1974, at which the applicant and a protestant were heard;

NOW THEREFORE, the Board, after due consideration, does hereby ORDER that the RESTATED CHARTER for the Weirton Bank and Trust Co., Weirton, West Virginia, by APPROVED and transmitted to the Secretary of State, together with a copy of this ORDER, for processing.

The Board does provide the following findings of fact and conclusions of law on which such approval is based:

### FINDINGS OF FACT

(1) The public convenience and advantage will be promoted by the establishment of this bank.

---

(6) Provision has been made for suitable banking house quarters in the community specified in the application.

(c) In the course of its examination and investigation, the board may call upon the attorney, agent or other responsible person representing the incorporators and upon the incorporators for additional information and disclosures it deems necessary in taking appropriate action on and making proper disposition of the application.

(2) Local conditions assure reasonable promise of successful operation for the proposed bank and those banks already established in the area.

(3) The proposed capital structure is adequate.

(4) The proposed officers and directors have sufficient banking experience, ability, character and standing to assure reasonable promise of successful operation.

(5) The name of the proposed bank is not so similar as to cause confusion with the name of an existing bank.

(6) Provision has been made for suitable banking house quarters in the community specified in the RESTATED CHARTER.

## CONCLUSIONS OF LAW

Based upon the above findings of fact, the Board concludes that the requirements of Chapter 31-A of the West Virginia Code relating to the chartering of new banks have been satisfied and therefore approves this RESTATED CHARTER.

This ORDER is entered pursuant to action taken at a meeting of the said West Virginia Board of Banking and Financial Institutions held at Charleston, West Virginia on the 9th day of December, 1974, and the Minutes of the said Board authorize the Chairman to execute this ORDER of approval.

### A.

It is the underlying theory of administrative law as it has evolved in this country since the early part of the Twentieth Century that the business of government cannot be conducted in any meaningful sense exclusively by democratically elected and politically responsive officials. In fact, one wonders upon viewing the agencies which have been designed by legislatures to carry on the day-to-day business of government, such as, in West Virginia, the State Board of Regents, State Board of Education, State Board of Health, and numerous others,

whether the Legislature deliberately intended to remove decision making from anything which resembles a political process. Nevertheless, it has been generally recognized that the Legislature can delegate a substantial amount of policy making to other creatures of its own making which are for all practical purposes immune from political consequences.[2]

The *ad hoc* development of administrative law in the first forty years of this century produced a creature which looked very much like the famous elephant, which was allegedly a horse designed by a committee. The Federal and State administrative procedures acts were for all intents and purposes merely codifications of common law developments generated by imaginative lawyers and innovative judges under the due process and equal protection clauses.[3]

---

[2] Most doubts about the power of Congress to delegate legislative power to administrative agencies on the federal level have been laid to rest. As the U. S. Supreme Court said in 1940: "Delegation by Congress has long been recognized as necessary in order that the exertion of legislative power does not become a futility." *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 at 398 (1940). For a more current statement on the issue, *see Arizona v. California*, 373 U.S. 546 (1963).

In West Virginia the proscription against delegation of legislative power is still strongly worded; nonetheless, the rule is not much different in practice from that observed in the federal government. *See, e.g. State ex rel. West Virginia Housing Dev. Fund v. Copenhaver*, 153 W. Va. 636, 171 S.E.2d 545 (1969) which affirms that the Legislature can delegate broad discretionary powers to administrative agencies and *State ex rel. West Virginia Housing Dev. Fund v. Waterhouse*, ____ W. Va. ____, 212 S.E.2d 724 (1974) stating that the legislature is allowed great leeway in setting forth guidelines or standards for administrative agencies.

[3] For a good discussion of the problems of judicial review of agency action in a due process context before the Administrative Procedures Act, *see, St. Joseph Stock Yards Co. v. U. S.*, 298 U.S. 38, (1936). The federal Administrative Procedures Act, passed by a unanimous vote in both the Senate and the House, did not disturb the basic scheme of judicial review which had been theretofore developed:

"The major effects of the Act were to satisfy the political will for reform, to improve and strengthen the administrative process, and to preserve the basic limits upon judicial review of

One may suspect, and almost reasonably infer, that one of the purposes of court review in administrative law is to use the somewhat cumbersome judicial procedure to inject the same conservative bias into the administrative process which is inherent in the legislative process.[4] In this regard in the 1930's it may well have been the intention of those who developed administrative law to take major policy decisions out of the hands of young, academically well-trained, politically inexperienced, and overly eager administrators and place them in the hands of more seasoned, older, and socially more conservative federal and state appellate judges.[5] At

administrative action ... the APA ... transferred no power back to the courts [and] did not substantially increase judicial review...." 1 Davis, *Administrative Law Treatise* 30.

The Model State Administrative Procedure Act, upon which *W. Va. Code,* Chapter 29A is based, does not differ significantly from the federal Administrative Procedures Act in its impact on judicial review. *See,* Abel *The Double Standard in Administrative Procedure Legislation: Model Act and Federal Act,* 33 *Iowa L. Rev.,* 228 (1948).

[4] For a further elaboration of this thesis, *see:* R. Neely, "To the Museum With Due Process," *Juris Doctor* (October, 1975), page 53.

[5] The premier example in support of this controversial position arose in the most experienced court in the Country in administrative law, the U. S. Circuit Court of Appeals for the District of Columbia in the landmark administrative law case of *International Harvester Company v. Ruckelshaus,* 478 F.2d 615 (D. C. Cir. 1973), where the issue was joined in the debate between Judge Harold Leventhal and Chief Judge David L. Bazelon. The case involved judicial review of a decision by the Administrator of the Environmental Protection Agency denying applications for a one year suspension of the 1975 emission standards prescribed by the Clean Air Act for light-duty vehicles. Speaking for a majority of the panel, Judge Leventhal remanded the case for further proceedings in the Agency.

Judge Leventhal explicitly recognized the policy making function of reviewing courts in administrative proceedings, and further delved deeply into the evidence, the methodology by which the Administrator reached his conclusions regarding the weight of the evidence, and the risks of an incorrect decision either way. Judge Leventhal said:

This case ultimately involves difficult issues of statutory interpretation, as to the showing required of applicants to sustain their burden that technology is not available. It also taxes our ability to understand and evaluate technical issues upon

least in theory this Court does not endorse this approach, yet we recognize at the same time that we are not confronted with the same grandiose, complex, and far reaching policy questions which confront our brethren on the Federal bench.

In any event the theory of administrative law recognizes that it is impossible in any complex society such as our own for any system to guarantee correct results—all positions of power are staffed by men, not computers, and men are inherently fallible. The grand design of administrative law is to guarantee the rationality of the

which that showing, however it is to be defined must rest. At the same time, however, larger questions are at stake . . . This task of reviewing the suspension decision was not assigned to us lightly. It was the judgment of Congress that this Court, isolated as it is from political pressures, and able to partake of calm and judicious reflection would be a more suitable forum for review than even the Congress. *Id.* at 633.

This kind of cooperation, a unique three-way partnership between the legislative, executive, and judiciary, was contemplated by Congress and is apparent in the provisions of the Act. *Id.* at 635.

This case inevitably presents *to the court as to the Administrator*, the need for a perspective on the suspension that is informed by an analysis which balances the costs of a "wrong decision" on feasibility against the gains of a correct one. *Id.* at 641 [Emphasis supplied.]

Our central difference with the Administrator, simply put, stems from our view concerning the Congressional intent underlying the one year suspension provision. *Id.* at 648.

Judge Bazelon argued the more traditional theoretical view in his concurring opinion in which he said:

My brethren and I are reaching for the same end—a "reasoned decision"—through different means. They would have us examine the substance of the decision before us. There are some areas of administrative law—involving issues of liberty and invididual rights—where judges are on firm ground in undertaking a substantive review of agency action. But in cases of great technological complexity, the best way for courts to guard against unreasonable or erroneous administrative decisions is not for the judges themselves to scrutinize the technical merits of each decision. Rather, it is to establish a decision-making process which assures a reasoned decision that can be held up to the scrutiny of the scientific community and the public. . . . *Id.* at 652.

process through which the results are determined, and thereby help guarantee the rationality of the results.[6] In this way it has been thought that elaborate, and therefore necessarily conservatively biased, procedure can produce a fair substitute for an actual democratic-legislative process.

The same theory has been brought to bear historically in a slightly different context in courts of last resort where the judges are expected to write opinions justifying their decisions in major cases. No judge who has ever sat on an appellate court for any length of time is without a story of a decision which he ardently wished to make in favor of one party, only to find that justice or his own personal philosophy notwithstanding, an opinion in support of that decision just could not be written. As Henry Adams once indicated, the inveterate predilection to set things down on paper impels one to seek out things worthy of being put down on paper. Writing and conversation are great catalysts to thought, and the greatest checks upon irrationality on the thought process.

### B.

Accordingly when *W. Va. Code*, 29A-5-3 (1964) says:

"Every final order or decision rendered by any agency in a contested case shall be in writing or

---

[6] Support for the proposition stated in the text comes from both Judge Harold Leventhal of the U. S. Circuit Court of Appeals for the District of Columbia and Kenneth Culp Davis, the preeminent scholar of Administrative law. Judge Leventhal recently reviewed Davis's *Administrative Law of the Seventies,* and in his review, he points out:

If the nondelegation doctrine is a dim though still flickering star in the firmament of administrative law, the requirement of reasoned decision making is a brilliant sun. Under that requirement an agency must develop standards and adhere to them without discrimination; it may reserve the latitude to change standards deliberately, but not to ignore them casually or haphazardly. This theme pervades Professor Davis's 1976 volume, as it has dominated his teaching and thinking. Our views are entirely congruent.... Leventhal, Book Review, 44 *U. Chi. L. Rev.,* at 263 (1976).

stated in the record and shall be accompanied by findings of fact and conclusions of law. . . ."

the law contemplates a reasoned, articulate decision. When we are concerned with very complex cases involving evidence which cannot adequately be evaluated by laymen, or when we are concerned with cases involving an intricate interfacing of fact-finding and policy making, the ideal order would set forth: (1) the agency's basic value judgments which are dictated by its interpretation of the statutory purposes; (2) the random facts which have been presented to the agency in support of various positions which the agency determines to be relevant to the agency decision; (3) the methodology by which those facts have been evaluated, *i.e.*, credibility of witnesses, validity of tests and statistical data, accuracy of expert predictions, etc.; (4) an integrating theory which organizes the random evidentiary facts in an intelligent and comprehensible way; and, (5) a conclusion based upon the theory developed, supported by the facts, concerning whether a proposed action is in furtherance of the purposes set forth in the statute, along with an explanation of any change in agency policy from former practice. The logical process can be graphically represented in the figure *post*. This is the standard methodology taught to every first year graduate student in any science or social science curriculum.

It is important to note that this methodology is designed to deal adequately with cases involving complex issues and expert testimony. We do not intend to imply that an agency need make a Federal case out of every simple, contested matter. The complexity of the agency opinions should be in keeping with the complexity of the case. However, in every contested case, *W. Va. Code*, 29A-5-3 (1964) contemplates a decision in which the agency sets forth the underlying evidentiary facts which lead the agency to its conclusion, along with an explanation of the methodology by which any complex scientific, statistical, or economic evidence was evaluated. In this regard, if the conclusion is predicated upon a change of

THE
CONCLUSION

(If predicated on
change of policy from
former agency practice why
policy was changed.)

An integrating theory or method of
organizing the facts so that they answer
the question whether a proposed action is in
furtherance of the legislative purpose.

Observed random facts which the Board finds helpful in
determining whether a proposed action will be in furtherance of
what the Legislature seeks to achieve, along with the methodology
by which the facts were evaluated and selected.

Basic value judgments, i.e., how the Agency interprets what the
Legislature seeks to achieve.

agency policy from former practice, there should be an explanation of the reasons for such change.

Whenever an agency may be permitted to state its findings of fact in bare statutory language, the decision may be rendered by a clerk or secretary who has been given the agency's ultimate conclusion, *i.e.*, in this case, "application granted," and assigned the task of filling in the appropriate form. This is not the rational thought process contemplated by the Administrative Procedures Act.[7]

---

[7] It is worth noting that *Code*, 29A-5-3 (1964) follows substantially the language of the model *State Administrative Procedure Act*, § 12, and follows the language *exactly* for the portion of our statute with which we are concerned. Thus the Uniform Law Commissioners' comment to § 12 can be helpful in exposing the underlying rationale of this section. They say:

## II.

In this case the appellant also asserts that the findings of the Board are contrary to the evidence. In the proceedings before the Board extensive statistical information was presented, including among other submissions such things as the annual valuation of building permits in the City of Weirton for numerous years, census figures demonstrating rates of growth in cities similar to Weirton, statements of changes in the financial position of the Weirton Savings & Loan Company, economic and demographic trends of selected political subdivisions from 1950 through 1970, and community and county profiles submitted by the Weirton Chamber of Commerce. In addition there was expert testimony from the Board's own field investigation report as well as appellant's outside economist and members of the appellee Savings and Loan institution's staff.

Neither this Court nor the Circuit Court of Kanawha County alleges to be expert in the evaluation of economic data. Furthermore, on the basis of the record before

---

An attempt is here made to require agency findings to go beyond a mere statement of a general conclusion in the statutory language (e.g., that "public interest, convenience and necessity" will be served) or in language of similar generality. The intent is to require the degree of explicitness imposed by such decisions ... where the court required a statement of the "basic or underlying facts." Several states have concerned themselves with this problem. Missouri has adopted the requirement that findings of fact and conclusions of law shall be "separated." North Dakota and Virginia require that findings shall be "explicit." The desire is to find the proper middle course between a detailed reciting of the evidence on the one hand and the bare statement of the conclusions of fact or the "ultimate" facts on the other. The phrase "underlying facts supporting the finding" seems about right.

For other jurisdictions' response to this problem *see Geraud v. Schrader*, 531 P.2d 872 (1975) and *First State Bldg. & L. Ass'n. v. Arkansas S. & L. Bd.*, 257 Ark. 599, 518 S.W.2d 507 (1975). For a West Virginia case which concerns a different portion of the *W. Va. Code*, but which is helpful in illuminating West Virginia's requirements as to agency specificity in findings of fact and conclusions of law, *see, Mountain State Trucking v. Public Service Commission*, ___ *W. Va.* ___, 216 S.E.2d 566 (1975).

us we are unable to evaluate the credibility, statistical accuracy, or methodological integrity of the evidence presented to the Board, which we have been asked to review. Quite frankly we cannot tell whether the decision of the Board was supported by the evidence in this case.

If the Board's findings of fact and conclusions of law had been drafted in proper form, then we could have applied the appropriate standard of review, namely, did the evidence in any reasonable way support the findings of fact, and further did the findings of fact support the Board's conclusions of law. This is why the Board must discuss what random facts presented in evidence are probative, what testimony is methodologically sound, or to the contrary, unsound, and why, and the logical thought processes which connected facts which a lay court might not find relevant, to a particular expert conclusion reached by the Board. Accordingly we decline to review the evidence in this case until such time as the appellee Board has sifted, organized, and evaluated the evidence in light of its own substantial expertise in these matters and presented a proper explanation of its action to the trial court.

For the reasons stated in this opinion, the judgment of the Circuit Court of Kanawha County is reversed and the case is remanded to the West Virginia Board of Banking and Financial Institutions with directions to reconsider the record as it was submitted to the Board at the time its final order was entered, and to prepare an order in conformity with the guidelines in this opinion. It is further ordered that until such time as the Board renders its decision, the appellee, Weirton Bank & Trust Company, be permitted to operate in the same manner that it does at present.

*Reversed and remanded.*