THE CHESAPEAKE AND POTOMAC CO. OF W. VA.

*v.*

STATE TAX DEPARTMENT

*and*

RICHARD L. DAILEY, *Commissioner*

(No. 13740)

Decided December 20, 1977.

*Chauncey H. Browning,* Attorney General, *William F. Carroll,* Deputy Attorney General, for appellants.

*Jackson, Kelly, Holt & O'Farrell, Thomas N. Chambers, John J. Cowan, Robert A. Levetown, John M. Kelleher, John W. Plaatje,* for appellee.

NEELY, JUSTICE:

This is an appeal from a judgment of the Circuit Court of Kanawha County which set aside a tax assessment against the plaintiff, Chesapeake and Potomac Telephone Company [Taxpayer]. Upon Taxpayer's motion for summary judgment the circuit court found the assessment null and void, and permanently restrained the State Tax Commissioner[1] from collecting the tax assessed. We reverse.

In 1969 the Commissioner made a delinquency tax assessment, composed of $1,068,179.20 in tax and $299,785.71 in penalty, against Taxpayer for 1961-1965 privilege taxes, levied under *W.Va. Code*, 11-12A-4 and 5 [1959].[2] The delinquency assessment was made under that Chapter of the *W.Va. Code*, which was captioned "Privilege Tax on Certain Carrier Corporations" until it was revised by Chapter 187, *Acts of the Legislature*, 1967 Regular Session, effective July 1, 1967, and re-captioned "Annual Tax on Incomes of Certain Carriers."

Taxpayer filed a timely petition for reassessment, and a hearing on the petition was held September 23, 1969. The Commissioner's administrative decision on the petition, rendered September 16, 1971, affirmed the assessment of the tax, but waived the penalty. Taxpayer appealed this administrative decision to the Circuit Court of Kanawha County and that appeal is still pending in the circuit court. Later, on January 29, 1974, Taxpayer

---

[1] The present State Tax Commissioner, David C. Hardesty, Jr., has been substituted in this appeal for his predecessor, Thomas R. Goodwin. In turn, Goodwin's predecessors, Richard L. Dailey and Charles H. Haden II, have also been involved in different stages of these complex proceedings. For convenience in this opinion we will simply refer to the State Tax Commissioner, or Commissioner, without distinguishing by name among the various incumbents of that office.

[2] *W.Va. Code*, 11-12A-5 [1959] was amended in 1962, during the time of the tax assessment here in question. The amendment, however, was not relevant to the issues in this case. Accordingly, for convenience, we will refer to the statutes upon which the Commissioner based his assessment as *W.Va. Code*, 11-12A-4 [1959] and *W.Va. Code*, 11-12A-5 (1959) respectively.

filed a separate action in the Circuit Court of Kanawha County seeking a declaratory judgment that the whole assessment was void. Unlike the tax appeal, the declaratory judgment action was prosecuted to a conclusion, and the circuit court held that the Commissioner had no authority to levy the tax. It is from that declaratory judgment that this appeal was prosecuted.

## I

The Commissioner argues that the circuit court committed error by entertaining an attack upon the tax assessment in an original declaratory judgment action completely separate from the appeal from the Commissioner's administrative decision. Taxpayer instituted the original civil proceeding in the circuit court pursuant to *W.Va. Code*, 55-13-2 [1941], which provides:

> "Any person interested under a deed, will, written contract, or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder."

This statute standing alone indicates that Taxpayer's declaratory judgment action is proper in the circumstances here presented. We must, however, read the declaratory judgment statute in tandem with the statutes providing for judicial review of the Commissioner's administrative decisions. *W.Va. Code*, 11-12A-8d [1963] and *W.Va. Code*, 11-12A-13 [1967]. These tax statutes do not proscribe declaratory judgment actions in the tax matters comprehended here or suggest that a tax appeal is the exclusive procedure by which the Commissioner's administrative decisions can be challenged. Accordingly, we conclude the Circuit Court of Kanawha County properly exercised its jurisdiction in taking cognizance of Taxpayer's declaratory judgment action.

Our conclusion is supported by *Walter Butler Building Co. v. Soto*, 142 W. Va. 616, 97 S.E.2d 275 (1957), the most recent and persuasive case cited by the parties on this procedural point. In *Butler* the taxpayer challenged a business and occupation tax assessment by petitioning for reassessment in essentially the same way as Taxpayer here did. Following denial of its petition, the taxpayer in *Butler* took an appeal from the Commissioner's decision to the Circuit Court of Kanawha County. The business and occupation tax appeal procedure in *Butler* was substantially the same as the procedure involved here. While the tax appeal was pending, the *Butler* taxpayer instituted a separate suit in equity, attacking the validity of the statute upon which the assessment was based. It was the separate equity action which ultimately reached this Court for decision. The procedural similarities between *Butler* and the present case greatly outweigh the minor differences; therefore, *Butler* is persuasive by way of analogy on the procedural point here presented. *Butler* clearly approves a method by which a taxpayer may collaterally attack a tax asssessment even while a tax appeal relating to the same assessment is pending, and we adopt that approach, holding that Taxpayer's declaratory judgment action was properly lodged in the Circuit Court of Kanawha County.

In addition to what may be gleaned from *Butler* by way of analogy, *Butler* makes the following cogent remarks about declaratory judgment actions in the tax context, 142 W. Va. at 634–635, 97 S.E.2d at 286:

> "[T]here is no substantial difference between a declaratory judgment proceeding instituted by a taxpayer against the State Tax Commissioner involving the assessment of a tax against the taxpayer under the declaratory judgment statute ... and an appeal taken by a taxpayer against the State Tax Commissioner from an assessment of a tax against the taxpayer under Section 8, Article 13, ... In a declaratory judgment proceeding the taxpayer institutes a suit against the State Tax Commissioner to determine the validity of an assessment against the taxpayer

and his liability to pay the tax. In taking the appeal provided by Section 8 of the statute the taxpayer proceeds against the State Tax Commissioner in the manner prescribed by Sections 7b and 8. The object and the purpose of each proceeding are to enable the taxpayer to controvert and present his defense against a tax previously assessed against him by the State Tax Commissioner which if valid and not challenged in either proceeding will become final and render him liable for its payment. The identical issue to be determined in each proceeding is the validity of the assessment of the tax and the liability of the taxpayer to pay the tax. In each proceeding the taxpayer does not seek a recovery of money or other property of the State, to control the discretion of an official, to compel the State or its officials to make or perform a contract in behalf of the State, or to supplant, restrict, or adversely affect any established proprietary right or interest of the State. The utmost relief which the taxpayer can obtain in either proceeding is a judicial determination that the tax assessed is invalid and that he is not required to pay it; and the burden rests upon the taxpayer to establish that result by proper proof."

We are in accord with these comments, and in particular with the idea that declaratory judgment proceedings are distinguished as much by what they cannot do as what they can do. The most Taxpayer can hope to obtain here, aside from ancillary injunctive relief, is a declaration of the invalidity of the Commissioner's tax assessment based on the alleged invalidity of the underlying tax statute. The resolution of questions concerning the validity of statutes is a judicial function appropriately exercised in original declaratory judgment proceedings. It does not involve courts in a complicated review of administrative agency action, where the proceedings before the administrator and his findings of fact and conclusions of law would be crucial to the outcome,[3] nor

---

[3] For a good discussion of the complex problems involved in judicial review of administrative agency action and why in some cir-

does it require the taking of evidence which might better be adduced at the administrative level. So long as the issues in declaratory judgment actions are narrowly limited to legal questions ripe for summary judicial determination, we approve the use of declaratory judgment actions to challenge the validity of tax assessments.

Our holding in this regard is consistent with, and to an extent a logical extension of, *Virginia Electric and Power Company v. Haden*, W. Va., 200 S.E.2d 848 (1973). There we held that in statutory appeals from the Commissioner's business and occupation tax assessments, the circuit court can:

> "... make a judicial determination of the correctness of the administrative decision, but ... not ... receive new evidence in making a determination of the issue. To allow the circuit court to determine an issue on evidence not considered at the administrative hearing would cast the court in the role of performing an executive function. Under the acknowledged principle of separation of powers this cannot be permitted. Thus the circuit court must decide the case on the evidence in the record as it was received or it must return the case to the Tax Comissioner for the further presentation of evidence." [200 S.E.2d at 853]

Likewise, we say now that no circuit court in declaratory judgment actions brought to challenge the validity of tax assessments may receive evidence concerning the factual basis of the Commissioner's administrative decision.

## II

Having resolved the jurisdictional question, we turn now to the merits of the controversy. Although the argument has been divided into several related questions,

---

cumstances the full adminstrative record ought to be brought before the court, *see Citizens Bank, etc. v. W. Va. Bd. of B & F. Inst.*, W. Va., 233 S.E.2d 719 (1977).

the fundamental issue is whether Chapter 187, *Acts of the Legislature*, 1967 Regular Session, repealed *W.Va. Code*, 11-12A-4 and 5 [1959] so that after July 1, 1967 the Commissioner was without power to assess taxes under these statutes.

Chapter 187, *Acts of the Legislature*, 1967 Regular Session, begins with the following language:

> "AN ACT to repeal article twelve-a, chapter eleven of the Code of West Virginia, one thousand nine hundred thirty-one, as amended, and enact in lieu thereof a new article twelve-a of said chapter, relating to an annual tax on incomes of certain carriers.

> "Be it enacted by the Legislature of West Virginia:

> "That article twelve-a, chapter eleven, of the Code of West Virginia, one thousand nine hundred thirty-one, as amended, be repealed and a new article twelve-a of said chapter be enacted in lieu thereof, to read as follows: ..."

This language plainly indicates that Chapter 187 repealed *W.Va. Code*, 11-12A-4 and 5 [1959]. A further examination of Chapter 187 reveals that it included no express saving provisions. The legal effect of such a repeal, in the absence of a saving clause, is well stated in the first three Syllabus Points of *Curran v. Owens*, 15 W. Va. 208 (1879):

> "1. The general rule is, that when an act of the Legislature is repealed without a saving clause, that it must be considered, except as to transactions passed and closed, as if it had never existed.

> "2. A right of action, which does not exist at common law but depends solely upon statute, falls with the repeal of the statute without a saving clause or a general law saving pending suits, unless that right has been carried into judgment.

"3. If pending such action, before there is a judgment, the law, which gives the right to bring the suit, is repealed without a saving clause or such general law as to suits pending, no further step towards judgment can be taken in such suit."

While these propositions were formulated nearly 100 years ago, they remain good law in West Virginia. If no other mitigating legal principles were applicable here, *Curran* would suggest that the Commissioner's 1969 assessment against Taxpayer is null and void.

The Commissioner, citing Annot., 77 A.L.R.2d 336 (1961), 50 Am. Jur. *Statutes* § 533 (1944), and 82 C.J.S. *Statutues* §§ 294 and 295 (1953) for authority, argues that his tax assessment is saved in this context by what is termed the "substantial reenactment doctrine." The Commissioner formulates the doctrine as follows:

"The general rule is that where a statute is repealed by a new statute which relates to the same subject matter and which reenacts substantially the provisions of the earlier statute, and the repeal and reenactment occur simultaneously, the provisions of the original statute which are reenacted in the new statute are not interrupted in their operation by the so-called repeal but are regarded as having been continuously in force from the date they were originally enacted."

The circuit court accepted the validity of the substantial reenactment doctrine, as do we. The doctrine was early recognized in West Virginia, again in the important case of *Curran v. Owens*, 15 W. Va. 208 (1879), Syllabus Point 7 of which states:

"But if the section in the old act, which gave the right of action, is substantially re-enacted in the repealing statute, so that there is no moment of time when the repealed section was not the law, although no reservation is made as to pending suits, the re-enacted section continues in uninterrupted operation; and suits brought thereon

are saved; but otherwise, as in this case, if not substantially re-enacted."

*See also, State v. Mason,* 141 W. Va. 217, 89 S.E.2d 425 (1955) and *Moore v. Commonmwealth,* 155 Va. 1, 155 S.E. 635 (1930). In our view the doctrine of substantial reenactment, as applied to the facts of this case, defeats Taxpayer's attack on the Commissioner's 1969 tax assessment.[4]

---

[4] At this point we set out for reference the pertinent parts of *W.Va. Code,* 11-12A-4 and 5 [1959] and the revised counterparts of these statutes, *W.Va. Code,* 11-12A-2 and 3 [1967].

*W.Va. Code,* 11-12A-4 [1959] states:

"Every motor vehicle carrier operating on public highways of this State and every railroad car corporation, express corporation, or company, pipeline corporation, telephone and telegraph corporation, airline corporation or company and operator of a steamboat or other watercraft, for the transportation of passengers or freight, doing business in the State shall pay to the State an annual privilege tax for each calendar year for the privilege of doing business in the State. This tax shall be equal to the gross income from all business beginning and ending within the State multiplied by the respective rates as follows: Motor vehicle carriers, railroad car corporations, express corporations or companies, pipeline corporations, one and one half per cent; telephone corporations, two and three fourths per cent; telegraph corporations, five per cent; and airline corporations and operators of steamboat or other watercraft, three per cent."

*W.Va. Code,* 11-12A-5 [1959] states in pertinent part:

"In addition to the tax imposed in the preceding sections, every motor vehicle carrier operating on the public highways of the State and every railroad corporation, railroad car corporation, express corporation or company, pipeline corporation, telephone and telegraph corporation, airline corporation or company, and operator of a steamboat or other watercraft, for the transportation of passengers or freight, doing business in this State shall pay an annual privilege tax for each calender year for the privilege of doing business in the State, to be determined as follows:"

. . .

"(e) The tax as to telephone and telegraph corporation shall be two and three fourths per cent of net income earned within the State as to telephone corporations, and five percent as to telegraph corporations, such income to be determined by ascertaining a sum bearing the proportion to the total net income of

A formal comparison of the old and new statutes clearly demonstrates that the new statutes substantially reenact the old. The new statutes change the tax rates and make minor changes in the way enterprises covered by these statutes are listed. Nonetheless, using substan-

---

the corporation that its business done in West Virginia, measured in wire-miles, bears to all business done, measured in like fashion;

.  .  .

"(g) In computing the tax imposed by this section the total net income of a taxpayer, who shall have been taxed under the preceding section [§ 11-12A-4], shall be reduced by an amount bearing the proportion to such total net income that the gross income of the taxpayer which is the measure of the tax under the preceding section bears to its total gross income from all business done wherever conducted. This section shall not apply to a taxpayer taxed under the preceding section and engaged exclusively in business within this State."

*W.Va. Code*, 11-12A-2 [1967] states:

"Every motor vehicle carrier operating on the public highways of this state and every railroad car carrier, railroad carrier, express company, pipe line company, telephone and telegraph company, airline company and any person operating a steamboat or other watercraft, for the transportation of passengers or freight, doing business in the state shall pay to the state an annual tax for each calendar year. This tax shall be equal to the gross income from all business beginning and ending within the state multiplied by the respective rates as follows: Motor vehicle carriers, railroad car carrier, railroad carrier, express companies, pipe line companies, airline companies, any person operating a steam boat or other watercraft and telegraph companies, three per cent; and telephone companies, three and four-tenths per cent: *Provided*, That any motor vehicle carrier which is an urban or suburban bus line shall be taxed at the rate of two per cent of such gross income."

*W.Va. Code*, 11-12A-13 (1967) states in pertinent part:

"In addition to the tax imposed in the preceding section, every motor vehicle carrier operating on the public highways of the state and every railroad carrier, railroad car carrier, express company, pipe line company, telephone and telegraph company, airline company and any person operating a steamboat or other watercraft, for the transportation of passengers or freight, doing business in this state shall pay an annual tax for each calendar year on the net income earned within the state equal to three and four-tenths per cent of such net income for telephone companies and six per cent of such net

tially the same language, both old and new statutes tax certain carriers on gross income generated by business activity conducted entirely within the state and on apportioned net income generated by interstate business activity.

## III

While the formal comparison of the statutes might be sufficient to justify our conclusion that the new statutes substantially reenact the old, we must also address Taxpayer's argument that no substantial reenactment has actually occurred because the old and new statutes have different subject matter. This argument turns on the distinction between the levy by the old statutes of a "privilege tax" measured by income, and the levy by the new statutes of an income tax. While this appears to be merely a semantic distinction, Taxpayer contends that decisions of this Court and of the U. S. Supreme Court make taxes labeled privilege taxes invalid. Taxpayer apparently concedes that the new tax, which does not carry the objectionable privilege tax label, is valid. Hence, Taxpayer's argument is that the old and new statutes must perforce relate to different subject matter, since the old statutes are invalid while the new statutes are valid.

---

income for all other carriers included in this section, such net income to be determined as follows:

. . .

"(f) The net income of telephone and telegraph companies shall be determined by ascertaining a sum bearing the proportion to the total net income of the companies that its business done in West Virginia, measured in wiremiles, bears to all business done, measured in like fashion;

'(g) In computing the tax imposed by this section, the total net income of a taxpayer, who shall have been taxed under the preceding section, shall be reduced by an amount bearing the proportion to such total net income that the gross income of the taxpayer which is the measure of the tax under the preceding section bears to its total gross income from all business done wherever conducted. No county, city, town, village or other political subdivision of the state shall levy a license, net income or any other kind of tax on the business taxed under this article."

88

We have read numerous U. S. Supreme Court cases in an effort to determine the validity of the privilege tax involved in this appeal. Reading these cases, and following the distinctions and categories developed over the years, gives one a good impression of how hard it is to draw a line between fair state taxation of interstate business activity and unfair state taxation which is prohibited by the Commerce Clause of the *United States Constitution.* The U. S. Supreme Court has confronted this problem again and again, and their weariness and frustration is evident in the opening sentence of their most recent case on this subject: [[Once again we are presented with" 'the perennial problem of the validity of a state tax for the privilege of carrying on, within a state, certain activities' relating to a corporation's operation of an interstate business." [citations omitted]]][5] *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274 (1977). We are led to expect from this opening sentence that *Complete Auto* will formulate a definitive statement on privilege taxes, and we are not disappointed. Our impression of *Complete Auto's* authority is confirmed, we believe, by the fact that it expresses the unanimous view of the U.S. Supreme Court. Accordingly, we look to *Complete Auto* for the legal principles which determine the validity of the privilege tax involved in this appeal.

*Complete Auto* proceeds on two levels. First, it specifies the factors which legitimately bear on the validity of state privilege taxes imposed on interstate business activity conducted within state borders. These factors are whether the business activity is "sufficiently connected to the State to justify a tax," whether the tax is "fairly related to benefits provided the taxpayer," whether the tax "discriminates against interstate commerce," and, finally, whether the tax is "fairly apportioned." 430 U.S. at 287. These are important guidelines, but we note that their application is not at issue in this

---

[5] Our resort to complicated quotation mark style reflects the complexity of the problem and demonstrates that the U. S. Supreme Court has grown accustomed to frequent encounters with the problem.

case. Taxpayer has argued that the privilege tax is *per se* invalid because it is denominated a privilege tax; Taxpayer has not argued that the tax was unfairly applied in light of these or other guidelines. Whether the privilege tax, or its successor, measures up to these guidelines can be determined at another time if the question is ever properly raised.

It is the second level of *Complete Auto* that helps us more in this appeal. The second level is an analysis and rejection of the purely semantic approach to privilege tax questions. The U. S. Supreme Court reasons:

> "There is no economic consequence that follows necessarily from the use of the particular words, "privilege of doing business," and a focus on that formalism merely obscures the question whether the tax produces a forbidden effect. . . . [W]e now reject the rule of *Spector Motor Service, Inc. v. O'Connor* [340 U.S. 602 (1951)], that a state tax on the "privilege of doing business" is *per se* unconstitutional when it is applied to interstate commerce, and that case is overruled." [430 U.S. at 288-289]

We wholeheartedly welcome *Complete Auto*'s departure from semantic formalism and its emphasis on functional economic analysis.

At this point it should be obvious, in light of *Complete Auto*, that West Virginia's former privilege tax is not any more or less constitutional than the replacement tax passed by the Legislature, Chapter 187, *Acts of the Legislature*, 1967 Regular Session. Accordingly, since the old and new statutes cannot be distinguished on the basis of their constitutionality or unconstitutionality, and since the old and new statutes are otherwise substantially the same, we reiterate our holding that the new statutes substantially reenact the old. The Commissioner, therefore, was not deprived of the power to make his 1969 tax assessment under the repealed statutes, *W.Va. Code*, 11-12A-4 and 5 [1959].

Our decision concerning the constitutionality of the privilege tax appears at first blush to conflict with our earlier analysis in *State ex rel. Battle v. Baltimore & Ohio R.R. Co.*, 149 W. Va. 810, 143 S.E.2d 331 (1965), a case upon which Taxpayer heavily relies. *Battle*, however, is distinguishable, as a close examination of it reveals. While several issues were decided in *Battle*, we are only concerned in this appeal with the *Battle* court's response to the question of whether "the tax imposed by Section 5(b), Article 12A, Chapter 11, *Code*, 1931 as amended, . . . [violated] Article I, Section 8, the Commerce Clause, of the *Constitution of the United States* as a tax upon the interstate business of the defendant. . . ." 149 W. Va. at 815, 143 S.E.2d at 335. The material facts in *Battle* were not disputed, and it was developed in the opinion that a very large portion of the defendant railroad company's West Virginia rail traffic was moving in interstate commerce. In fact, for the years involved, less than one and one-half percent of the defendant's total West Virginia rail traffic originated and terminated in West Virginia.

The *Battle* holding on the pertinent question is complicated:

"From the foregoing authorities it is clear that when it appears that the net income received from intrastate commerce and the net income received from interstate commerce earned by a railroad company within this State, are capable of separation but have not been separated and the amount of each has not been separately determined and the income from interstate commerce is considerably larger than the income from intrastate commerce, a privilege tax imposed by the State upon such composite net income from intrastate and interstate commerce is an unreasonable burden upon interstate commerce in violation of Article I, Section 8, the Commerce Clause, of the Constitution of the United States, and to the extent that such tax is applied to the net income from interstate com-

merce it is an invalid tax." [149 W.Va. at 836, 143 S.E.2d at 346]

It is apparent from this holding that the *Battle* court did not strike down the statute involved in the appeal, but merely held its manner of application invalid.[6] With respect to the statute's application, the *Battle* court seemed to be particularly concerned about the apparent failure to segregate intrastate income from interstate income, and the great disproportion between intrastate and interstate earnings, both problems which are not involved here.

We need inquire no further into the *Battle* case, once we have determined that it did not strike down the statute involved in this appeal. Indeed, the *Battle* court in 1965 would not have been likely to strike down the statute in view of developing trends in U. S. Supreme Court case law at the time. As the U. S. Supreme Court pointed out in *Complete Auto*, at 279, a number of pre-1965 cases had:

> "... sustained a tax against Commerce Clause challenge when the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State."

---

[6] Any doubt about whether the *Battle* court invalidated the statute or merely its manner of application to particular circumstances is removed by the Court's syllabus point 3, which, quoting from an earlier case, states:

"A taxing statute, though valid on its face, may be invalid when applied to particular circumstances or conditions of a particular taxpayer." Point 3, syllabus, *Norfolk and Western Railway Company v. Field*, 143 W. Va. 219, 100 S.E.2d 796.

While Taxpayer relies heavily upon the *Battle* case as authority, this Court would likely decide the case differently today for the reasons indicated in the text of this opinion. Had *Battle* struck down the privilege tax as unconstitutional, rather than as unconstitutionally applied, then there would be issue preclusion and the question would be *res judicata*. However, there is no issue preclusion as *Battle's* decision goes only to the application of the tax to a particular railroad.

The cases to which the Supreme Court referred in *Complete Auto* included *General Motors Corp. v. Washington,* 377 U.S. 436 (1964); *Northwestern Cement Co. v. Minnesota,* 358 U.S. 450 (1959); *Memphis Gas Co. v. Stone,* 335 U.S. 80 (1948); and *Wisconsin v. J. C. Penny Co.,* 311 U.S. 435 (1940), the first three of which were cited in the *Battle* opinion.

Nonetheless, although there were signs pointing in the direction of *Complete Auto,* this Court in *Battle* did not have the benefit of *Complete Auto's* fully-developed modern guidelines or that case's functional economic analysis. Rather, we were just beginning to emerge from the milieu of formal semantic distinctions. Accordingly, this Court did not attempt a full-scale functional analysis of the complex formula provided by the old privilege tax statute for apportioning the tax according to the proportion of a taxpayer's interstate business activity conducted in the State.[7] Were we today to undertake an analysis of the old privilege tax, it is highly likely we would find it was fair and did not discriminate against interstate commerce.

The U. S. Supreme Court's effort to establish a free trade zone within the United States dates from *Gibbons v. Ogden,* 22 U.S. 1 (1824), and an important part of this effort has been constant federal vigilance to insure that state taxation does not discriminate against interstate commerce. In the complex area of tax the cases frequently turn on semantics beause the U. S. Supreme Court may have had no other choice in the 19th and early 20th centuries. Before the advent of computers, large staffs of well-trained accountants, accurate bookkeeping procedures, etc. it may have been impossible to enforce complex formulas designed fairly to apportion taxes among states when interstate commerce was involved. The law is always more or less circumscribed by

---

[7] The statutory formula for apportioning the privilege tax which applies to telephone and telegraph companies is set forth in footnote 4 above.

technology, and in an age where the U. S. Supreme Court was required to choose between unfair and rapacious taxation which would burden interstate commerce or no taxation at all it chose the latter, prefering national prosperity and commerce above all competing public policies.

It was, indeed, in response to the U. S. Supreme Court's grappling with semantics through decades during which the science of economics was in but its formative stages that this Court rendered its opinion in *Battle*, arduously attempting to bring some sense out of semantic nonsense. The repeal and reenactment of the *Code* sections under consideration in this case can only be perceived under the totality of the legal circumstances as an attempt to bring our semantics into line with those of the U. S. Supreme Court. The important point is that the tax is the same; its method of calculation is basically the same; and, foremost, the State's need for revenue and its conclusion that industry crossing state lines should provide its fair share of such revenue is the same. It is inconceivable to us that the Legislature, if the thought had occurred to that body, would have intended forgiveness of all taxes owing under the old statute by virtue of having enacted the new statute. The ludicrous result would then ensue that those who promptly paid their taxes in the applicable years would be forever deprived of their money while those who were dilatory, litigious, or contumacious would achieve a windfall.

Obviously a case of this type requires an inordinate amount of "rule selection" concerning whether statutes have been "substantially reenacted"; nonetheless, while rule selection is inherently unsatisfying intellectually, one of the few long-standing and easily applicable guides to the process is that the law does not contemplate an absurd or inequitable result.

For the reasons set forth above, the judgment of the Circuit court of Kanawha County is reversed and the

case is remanded with directions to enter judgment for the appellant.[8]

*Reversed and remanded.*

---

[8] In view of the fact that the Commissioner has prevailed in the appeal and we reverse the judgment of the Circuit Court of Kanawha County, it is unnecessary to reach or decide the Commissioner's assignment of error concerning the circuit court's striking his answer below.