386 S.E.2d 650

### The CONSUMER ADVOCATE DIVISION of the PUBLIC SERVICE COMMISSION of WEST VIRGINIA, on Behalf of the RESIDENTIAL AND SMALL COMMERCIAL CUSTOMERS OF HOPE GAS, INC.

v.

### The PUBLIC SERVICE COMMISSION OF WEST VIRGINIA and Hope Gas, Inc.

No. 19080.

Supreme Court of Appeals of West Virginia.

Nov. 3, 1989.

---

Terry Blackwood, Deputy Consumer Advocate, Consumer Advocate Div., West Virginia Public Service Com'n, Charleston, for Consumer Advocate Div.

Marc A. Halbritter, Hope Gas, Inc., Clarksburg, E. Dandridge McDonald, McDonald & Rodecker, Charleston, for Hope Gas.

David Glover, Public Service Com'n, Charleston, for Public Service Com'n.

Thomas N. Hanna, Charleston, for West Virginia Small Public Utilities.

T.D. Kauffelt, Kauffelt & Kauffelt, Charleston, for Industrial intervenors.

Richard S. Shapiro, Mountaineer Gas Co., Charleston, for Mountaineer Gas Co.

Thomas McJunkin, Charleston, for Independent Oil & Gas Assoc.

McHUGH, Justice:

Pursuant to *W.Va.Code*, 24–5–1 [1979], this case is before this Court upon appeal from a final order of the Public Service Commission of West Virginia ("the PSC"). The appellant is the Consumer Advocate Division of the PSC ("the CAD"). The appellees are the PSC and Hope Gas, Inc. ("Hope"). For the reasons stated herein, we remand this case to the PSC for more explicit findings and conclusions and to address certain issues not addressed by the PSC.

I

On July 17, 1987, Hope, the second largest gas utility in West Virginia, filed an application with the PSC to change Hope's purchased gas rates. The administrative proceeding involved two issues pertinent to this appeal: (1) "unaccounted for gas" ("UFG") for the just-ended period of July, 1986 through June, 1987, and (2) a so-called "market adjustment" for the period of November, 1987 through October, 1988, for allocation of expected fixed costs to Hope's "small" customers, that is, to residential and small commercial customers.

In any natural gas system there will be natural gas lost, or "unaccounted for," between the point of purchase or production by a natural gas company and the point of sale to a customer. In other words, unaccounted for gas is natural gas purchased or produced by the company but never received by the consumers-ratepayers. There are many causes of UFG, including line leakage, theft, measurement errors, etc. As an incentive to control the amount of UFG, the PSC promulgated its new Rule 30–C in 1979 to require natural gas utilities to absorb excessive levels of UFG, rather than passing the entire cost of UFG on to the ratepayers. For utilities having the sales volume of Hope (more than 2,000,000 Mcf annual sales), the utilities' customers-ratepayers are required to pay for UFG up

to a maximum of 8% of the natural gas supply available. The natural gas utility is required to absorb UFG costs above that percentage.[1]

Over the past few years there has been a significant change in the natural gas industry. Most of the sales customers now are residential and small commercial customers, sometimes known as "captive" customers because of their relative economic inability to purchase their own natural gas or to shift to alternative energy sources. In contrast, larger customers now often purchase their own natural gas and use utilities like Hope only to *transport* their own natural gas. Thus, the same volume of natural gas in the gas utility's system consists now of mostly transported gas owned by the larger customers and less sales volume. That makes the same amount of UFG costs to be a higher percentage of natural gas available for sale, as there is less for sale by Hope.

Accordingly, Hope argued for an "interpretation" of Rule 30–C to allow inclusion of *transported* gas, as well as purchased gas, in the UFG percentage calculation, as part of a *purchased* gas adjustment proceeding. The UFG percentage calculation is as follows: subtract the estimated sales volume from the estimated total supply available (net of measured company use and free gas), to obtain the amount of UFG; divide the UFG amount by the estimated total supply available (net of measured company use and free gas), to obtain the percentage of UFG.[2] If Hope's "interpretation," including transported gas in the calculation, is followed, Hope's UFG percentage for the period in question is 7.41%, which is below the 8% maximum to be passed on to customers. If transported gas is excluded and only purchased gas is included in the calculation, the UFG percentage is 12.73% according to PSC staff figures and 14.05% according to the CAD's figures.[3]

The PSC's administrative law judge ("ALJ"), and upon review the PSC itself, ruled in favor of Hope. The ALJ concluded that the "interpretation" advanced by Hope was reasonable in light of the changed marketplace conditions with respect to the large volumes of transported gas. The ALJ also concluded that even if Rule 30–C should not be so "interpreted," Hope should be entitled to a waiver of the 8% UFG limit for the period in question, pursuant to the waiver language of such

---

1. The PSC's Rule 30–C is published in 10 *W.Va. Code of State Rules* § 150–2–13.2 (1983). It is also published in *Sixty–Sixth Annual Report of PSC of WV* 150–58 (1978–79).

2. The exact language of Rule 30–C with respect to the calculation of UFG is as follows:

[ (C) ] 3. Reduction For Estimated Excess Unaccounted For Gas. The Commission shall reduce the amount of purchased gas costs by the cost of excess unaccounted for gas. The cost of excess unaccounted for gas shall be computed as follows:

(a) Subtract the estimated volume of sales from estimated total supply available, net of measured company use and free gas, to obtain the total volume of estimated unaccounted for gas;

(b) Divide the estimated volume of unaccounted for gas by the total supply available, net of measured company use and free gas, to obtain the percentage of unaccounted for gas;

(c) Subtract the allowable percentage of unaccounted for gas from the estimated percentage of unaccounted for gas obtained in (C)3(b) to obtain the percentage of excess unaccounted for gas (If the estimated percentage of unaccounted for gas is equal to or less than the percentage of allowable unaccounted for gas, no adjustment in the amount of purchased gas costs is made under this division);

(d) Multiply the percentage of excess unaccounted for gas obtained in (C)3(c) by the amount of purchased gas costs in (C)1(a) to obtain the amount of excess unaccounted for gas costs by which such purchased gas costs must be reduced.

The difference between purchased gas costs and the amount of excess unaccounted for gas costs equals the amount of allowable purchased gas costs.

10 *W.Va.Code of State Rules* § 150–2–13.2(C)(3) (1983).

3. The first paragraph of Rule 30–C explicitly authorizes the PSC to "interpret" this rule: "The Public Service Commission of West Virginia may interpret this rule if necessary and may require appropriate action based upon any such interpretation."

The difference between the PSC staff's and the CAD's UFG percentages is based upon matters unrelated to unaccounted for gas, and such matters are not involved in this appeal.

rule.[4] The PSC itself in its final order expressly upheld the one-time waiver, but also implicitly approved the aforestated "interpretation," of Rule 30–C.

## II

The first issue in this case is whether the PSC's "interpretation" of its Rule 30–C is reasonable.

■ Interpretation of statutes or rules and regulations is proper only when an ambiguity exists. This Court has recently reiterated this point. Quoting syllabus point 3 of *Crockett v. Andrews*, 153 W.Va. 714, 172 S.E.2d 384 (1970), we stated, in syllabus point 1 of *Ooten v. Faerber*, 181 W.Va. 592, 383 S.E.2d 774 (1989), that even a long-standing "interpretation" by an administrative agency of its own rules should be disregarded when such "interpretation" conflicts with the clear language of the rules: " 'While long standing interpretation of its own rules by an administrative body is ordinarily afforded much weight, such interpretation is impermissible where the language is clear and unambiguous.' " In addition, an administrative "interpretation" developed, as here, during or shortly before the involved litigation is entitled to less weight than a long-standing administrative interpretation of administrative rules. *Ooten v. Faerber*, 181 W.Va. 592, 596, 383 S.E.2d 774, 778 (1989).

■ The language of Rule 30–C clearly applies to a natural gas utility's recovery of *purchased* gas costs in a *purchased* gas adjustment proceeding. The first paragraph of the rule contains this statement: "This rule sets forth a procedure for changing [the] rates per Mcf charged to customers by natural gas distribution utilities based *exclusively* on the cost of *purchased* gas including gas *purchased* by a utility and *related* transportation for delivery to its customers adjusted for ... excessive unaccounted for gas[.]" (emphasis added). In its discussion of the new rule at the time the same was promulgated, the PSC specifically referred to the need for limitations on the recovery by gas utilities "from consumers [of] the total cost of unaccounted for *purchased* gas." *Sixty–Sixth Annual Report of PSC of WV* 152 (1978–79) (emphasis added). Furthermore, Rule 30–C does not mention transported gas, as opposed to purchased gas, in the calculation of unaccounted for gas ("UFG"). UFG is defined as "the difference between total gas supply, net of measured company use and measured free gas[,] and total gas sales." *Sixty–Sixth Annual Report of PSC of WV* 155 (1978–79). "Total gas supply" is defined as "all *purchased* gas whether natural, synthetic, liquified, natural, propane or other manufactured gas, net [of] storage, net [of] exchange [gas] or net [of] borrowed gas, and gas *produced* by the utility." *Id.* (emphasis added). Again, transported gas is not mentioned. The parties agree that the reason for this omission is that there was very little transported gas at the time new Rule 30–C was promulgated in 1979.

On its face, then, Rule 30–C is concerned only with purchased gas available for sale to sales customers, as opposed to service-customer-owned, transported gas. The ALJ and the PSC did not explain why the change in the marketplace with respect to the volume of transported gas justifies Hope's "interpretation" of Rule 30–C, as opposed to an amendment to the rule. A statute, or an administrative rule, may not, under the guise of "interpretation," be modified, revised, amended or rewritten. *State v. General Daniel Morgan Post No. 548*, 144 W.Va. 137, 145, 107 S.E.2d 353, 358 (1959) (involving a statute).

Accordingly, we remand this case to the PSC for it to address the issue of whether a properly promulgated amendment to Rule 30–C, as opposed to a quasi-judicial "interpretation" of such rule, is necessary to include volumes of transported natural gas in the calculation of unaccounted for gas, in light of the fact that such rule refers only to purchased gas.

---

**4.** The first paragraph of Rule 30–C authorizes a waiver—as well as an interpretation, *see supra* note 3—of this rule: "If any provision of this rule would result in undue hardship for a utility or its customers, the Commission may modify the application of this rule appropriately."

## III

The next issue is whether the PSC's waiver of the 8% UFG limit in this case was in accordance with the requirements of Rule 30–C.

The ALJ and the PSC itself listed several factors supporting, in their opinion, a one-time waiver of the 8% UFG limit. Virtually all of these factors—leakage from old lines, rough terrain, measurement error, production losses, etc.—were, however, considered in 1979 when the PSC set the 8% limit on UFG in the new Rule 30–C. Moreover, waiver under Rule 30–C is proper only if there is an "undue hardship," *see supra* note 4, and the ALJ and the PSC found only a "hardship" from application of the rule, counterproductive to Hope's construction program to deal with excessive UFG.

In this situation, as elsewhere, administrative agencies must abide by their properly promulgated rules until they are lawfully changed. *C & P Telephone Co. v. Public Service Commission,* 171 W.Va. 708, 714, 301 S.E.2d 798, 804 (1983). As a specific application of this familiar principle, we hold that where a rule of the Public Service Commission of West Virginia authorizes a waiver of such rule in the event that a provision of the rule would result in "undue hardship," this Court, upon appeal from a final order of the Commission waiving such rule due to "hardship," will remand the case for the Commission to follow its rule by finding whether an "undue hardship" would result from application of the rule.

Therefore, this case is remanded to the PSC for it to find whether application of Rule 30–C to Hope would result in an "undue hardship." [5]

## IV

The final issue is whether the "market adjustment" was supported by the law and the evidence.

The "market adjustment" involves "freezing" the allocation of certain fixed costs to the large commercial-industrial class of customers for the 1987–88 period at the 1986–87 amount, thereby shifting increased fixed costs during the 1987–88 period to the small commercial-residential class of customers. The PSC, emphasizing the competition for "large" customers and the imperfections inherent in any cost allocation methodology, concluded that "the market adjustment reflects ... a reasonable cost allocation methodology which results in reasonable rates for recovery of purchased gas costs."

This merely conclusory language in the PSC's final order, along with an absence of factual findings explaining the methodology employed, preclude this Court from making any meaningful review of this issue. An administrative agency's "order must contain findings of facts, rather than conclusory statements, so as to withstand judicial scrutiny." Syl. pt. 3, in part, *Mountain Trucking Co. v. Public Service Commission,* 158 W.Va. 958, 216 S.E.2d 566 (1975). As we stated in *Monongahela Power Co. v. Public Service Comm[is- sion],* 166 W.Va. 423, 276 S.E.2d 179 (1981), this Court in several cases has stressed that it is critical for the Commission to make an adequate order which, upon appellate review, would make known to the Court the motivating circumstances which influenced the decision. *Id.* 166 W.Va. at 425–26, 276 S.E.2d at 181. Our holding on this point was set forth in syllabus point 1 of the *Monongahela Power* opinion, where we quoted syllabus point 3 of *Citizens Bank v. West Virginia Board of Banking & Financial Institutions,* 160 W.Va. 220, 233 S.E.2d 719 (1977). The latter states:

In administrative appeals where there is a record involving complex economic or scientific data which a court cannot evaluate properly without expert knowledge in areas beyond the peculiar competence of courts, neither this Court nor the trial courts will attempt to determine whether

---

**5.** It is uncontroverted that Hope did not attempt to assign some of the costs of UFG to transport customers during the period in question. In this regard it is significant that Hope began charging some of its transport customers a so-called "shrinkage fee" or "fuel charge" (of 4%), customary in the industry, immediately after the period in question.

**158**

the agency decision was contrary to the law and the evidence until such time as the agency presents a proper order making appropriate findings of fact and conclusions of law.

See also *Chesapeake & Potomac Telephone Co. v. Public Service Commission,* 171 W.Va. 494, 498, 300 S.E.2d 607, 611 (1982). This Court has also stated: "Without such record findings of an administrative agency, the Court on judicial review is greatly at sea without a chart or compass[.]" *Workman v. Workmen's Compensation Commissioner,* 160 W.Va. 656, 662, 236 S.E.2d 236, 240 (1977). Finally, "the law contemplates a reasoned, articulate decision which sets forth the underlying evidentiary facts which lead the agency to its conclusion, along with an explanation of the methodology by which any complex scientific, statistical, or economic evidence was evaluated." Syl. pt. 2, in part, *Citizens Bank v. West Virginia Board of Banking & Financial Institutions,* 160 W.Va. 220, 233 S.E.2d 719 (1977).[6]

We consequently remand this case to the PSC for more explicit findings and conclusions on the issue of the "market adjustment."

On remand the PSC should also address the related question of whether "flexing" of rates for marketplace competition reasons is to be reflected in *base* rates for transportation of natural gas, as opposed to being considered in a *purchased* gas adjustment proceeding, where certain *precise* costs are recovered. *See* 10 *W.Va. Code of State Rules* § 150–16–3.3(a) (1987).

### V

For the reasons stated in this opinion, this case is remanded to the PSC for it to make the findings and conclusions required herein.

Remanded.

---

**6.** These principles are applicable to orders in Public Service Commission cases. *See Monongahela Power Co. v. Public Service Comm[ission],* 166 W.Va. 423, 426 n. 4, 276 S.E.2d 179, 182 n. 4 (1981).