MONONGAHELA POWER CO.

*v.*

THE PUBLIC SERVICE COMM. OF W. VA.

(No. 14852)

Decided February 10, 1981.

*Richard S. Weygandt* and *Thomas C. Sheppard, Jr., Squire, Sanders & Dempsey, Alan P. Buchmann* and *Arthur E. Korkosz,* for petitioner

*Angela D. Williams,* Public Service Commission, for respondent.

MILLER, JUSTICE:

Monongahela Power Company (Company) appeals from a final order allowing the Company an approximate $5 million rate increase entered on December 21, 1979, by the Public Service Commission of West Virginia (Commission). The Company asserts that this rate increase is too low, particularly when viewed in light of past rate allowances, and therefore it amounts to a confiscation of the property of its investors. They also claim that this new rate makes it impossible for the Company to secure needed investment capital, which will jeopardize its ability to supply electric service to its customers in this State.

The Company is a wholly-owned subsidiary of the Allegheny Power System, Inc., a regulated public utility holding company.[1] The primary service area of the Company is thirty-two counties in northern West Virginia.[2] On December 18, 1978, the Company filed revised tariffs before the Commission requesting an approximate $18 million rate increase for furnishing electric service to its various customers in West Virginia.

By an order dated January 31, 1979, the Commission set five interim issues for hearing on April 10, 1979. The five interim issues were: (1) rate of return on invested capital; (2) consolidated tax savings; (3) construction work in progress; (4) normalization of federal income tax; and (5) rate designs for interim rates, including fuel allowance.

The interim hearing was subsequently advanced to April 5, 1979, and concluded on April 10, 1979. Briefs were submitted by the parties on May 4, 1979, and on May 31, 1979, the Commission entered its interim order granting

---

[1] In addition to Monongahela Power Company, the Allegheny Power System, Inc., owns the Potomac Edison Company and West Penn Power Company.

[2] Monongahela Power Company services a small portion of the state of Ohio adjacent to northern West Virginia but this area accounts for only 6% of its total revenue.

what it concluded to be an increase in annual rates or revenues of $12.6 million which included a 9.6% rate of return on invested capital.

Final hearings were conducted by the Commission on September 5, 6 and 7, 1979. Briefs were received from the various parties up until November 14, 1979.[3] On December 21, 1979, the Commission issued its final order, which in effect reduced the rates established in the interim order by $7.6 million and granted a $5 million increase in the Company's rates and required it to refund the excess amount collected under the interim order with interest payable on the refund of 11-3/4%.

## I. STANDARD OF REVIEW

We have in the past held that an order of the Commission based upon findings of facts will not be disturbed unless such findings are: (1) contrary to the evidence; or (2) without evidence to support them; or (3) arbitrary and capricious; or (4) a result of a misapplication of legal principles. *E.g., Virginia Electric & Power Co. v. Public Service Commission*, 161 W. Va. 423, 242 S.E.2d 698 (1978); *Boggs v. Public Service Commission*, 154 W. Va. 146, 174 S.E.2d 331 (1970); *United Fuel Gas Co. v. Public Service Commission*, 73 W. Va. 571, 80 S.E. 931 (1914).

We have also stated that because the Commission is experienced with the intricacies of the rate-making process we will ordinarily not substitute our judgment for that of the Commission on controverted evidence. *Charleston v. Public Service Commission*, 110 W. Va. 245, 159 S.E. 38 (1931). Additionally, we have recognized that the statute requires the utility to carry the "burden of proof to show that the proposed increased rate . . . is just and reasonable. . ." W. Va. Code, 24-2-4; *Natural Gas Co. v. Public Service Commission*, 95 W. Va. 557, 121 S.E. 716 (1924).

In several cases we have stressed the importance of the Commission making an adequate order or an opinion

---

[3] The Commission had permitted various industrial companies to intervene in the rate case, as well as Mountain Community Union, which represented residential electrical users.

"which, upon appellate review, would make known to the Court the motivating circumstances which influenced the decision." *Mountain Trucking Company v. Daniel*, 156 W. Va. 855, 860, 197 S.E.2d 819, 822 (1973); *see also, Mountain Trucking Company v. Public Service Commission*, 158 W. Va. 958, 216 S.E.2d 566 (1975). In Syllabus Point 3 of *Citizens Bank v. West Virginia Board of Banking and Financial Institutions*, 160 W. Va. 220, 233 S.E. 2d 719 (1977), we said with regard to complex administrative findings in general:

> "In administrative appeals where there is a record involving complex economic or scientific data which a court cannot evaluate properly without expert knowledge in areas beyond the peculiar competence of courts, neither this Court nor the trial courts will attempt to determine whether the agency decision was contrary to the law and the evidence until such time as the agency presents a proper order making appropriate findings of fact and conclusions of law."[4]

Other courts have also stressed the need for adequate findings by Public Service Commissions. *Greyhound Lines, Inc. v. Maryo*, 207 So.2d 1 (Fla. 1968); *Georgia Power Co. v. Georgia Public Service Commission*, 231 Ga. 339, 201 S.E.2d 423 (1973); *Cities Service Gas Co. v. State Corporation Commission*, 201 Kan. 223, 440 P.2d 660 (1968); *Mississippi Power Co. v. Mississippi Public Service Commission*, 291 So.2d 541 (Miss. 1974); *Gage v. Railroad Commission*, 582 S.W.2d 410 (Tex. 1979).

We have not articulated any precise formula as to an ultimate test, for the reasonableness and adequacy of a given rate, probably because much depends on the peculiarities of the individual case. In *Charleston v. Public Service Commission*, 110 W. Va. 245, 159 S.E. 38 (1931), we said that what is a fair net return for a public utility depends upon present day conditions. In the same case we

---

[4] While *Citizens Bank, supra,* dealt with a review under the administrative procedure act, W. Va. Code, 29A-1-1, *et seq.,* which excludes the Public Service Commission from its ambit, W. Va. Code, 29A-1-2, the case principles are clearly applicable to any administrative review.

found that an adequate net return would have to provide a sufficient amount to pay reasonable dividends and pass something to the surplus account. This latter statement is also contained in *Wheeling v. Natural Gas Company*, 115 W. Va. 149, 175 S.E. 339 (1934). In *United Fuel Gas Co. v. Public Service Commission*, 143 W. Va. 33, 99 S.E.2d 1 (1957), we stated that a utility is entitled to earn a reasonable return upon the whole of its property devoted to public service in this State and to the extent that it is deprived from such a return there is a confiscation of its property.

In this regard, one of the leading cases on what is a fair overall rate of return is *Bluefield Water Works & Improvement Co. v. Public Service Commission*, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923), where this Court was reversed when it approved too low a rate of return. In *Bluefield*, the rate of return was formulated by the Supreme Court so that it would correspond to returns made by comparable businesses. Generally stated, the amount of return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under economically efficient operation, to enable it to raise adequate funds to discharge its public duties. 262 U.S. at 693, 67 L.E. at 1183, 43 S.Ct. at _____ .

Recently in *Virginia Electric & Power Co. v. Public Service Commission*, 161 W. Va. 423, 242 S.E.2d 698, 704 (1978), we concluded that we could "find no evidence that the utility is not making money, is not able to attract investors, or is not providing the service it should— elements which, if proved, might require us to reach a different result. *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944)." Until 1968, the *Hope* case was preeminent in setting the federal standard for a just and reasonable rate.[5]

---

[5] The full text of the standard in *Hope* is:

"The rate-making process under the Act, i.e., the fixing of 'just and reasonable' rates, involves a balancing of the investor and the consumer interests. Thus we stated in the Natural Gas Pipeline Co. Case that 'regulation does not insure that the business shall produce net revenues.' 315 US p 590, 86 L Ed 1052, 62 S Ct 736. But such considerations aside, the investor interest has a legitimate

It emphasized the total impact of the rate order and indicated that "[t]he fact that the method employed [by the Commission] to reach that result [just and reasonable rates] may contain infirmities is not then important." 320 U.S. at 602, 88 L.Ed. at 345, 64 S.Ct. at 288. This test has been adopted by a number of states.[6] In the *Permian Basin Area Rate Cases*, 390 U.S. 747, 20 L.Ed.2d 312, 88 S.Ct. 1344 (1968), the Supreme Court adopted a more comprehensive standard of review for courts, which we believe integrates much of what has been scattered through our case law:

> "First, it must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The

concern with the financial integrity of the company whose rates are being regulated. From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. Cf. Chicago & G. T. R. Co. v. Wellman, 143 US 339, 345, 346, 36 L Ed 176, 179, 180, 12 S Ct 400. By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." 320 U.S. at 603, 88 L.Ed. at 345, 64 S.Ct. at 288.

[6] *See, e.g., Colorado Ute Elec. Ass'n v. Public Utilities Comm.,* 609 P.2d 861 (Colo. 1979); *People's Council v. Public Service Comm.,* 399 A.2d 43 (D.C. App. 1979); *Kansas-Nebraska Nat. Gas Co. v. State Corporation Comm.,* 4 Kan. App.2d 674, 610 P.2d 121 (1980); *Legislative Utility Consumers' Council v. Public Service Co.,* 119 N.H. 332, 402 A.2d 626 (1979); *Central Telephone Co. v. State Corporation Comm.,* 219 Va. 863, 252 S.E.2d 575 (1979).

court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors. Judicial review of the Commission's orders will therefore function accurately and efficaciously only if the Commission indicates fully and carefully the methods by which, and the purposes for which, it has chosen to act, as well as its assessment of the consequences of its orders for the character and future development of the industry." 390 U.S. at 791-92, 20 L.Ed.2d at 350, 88 S.Ct. at 1373.[7]

It can be discerned that this standard of review contains three areas of analysis. The first is a rather broad inquiry centering on whether the Commission abused or exceeded its statutory jurisdiction and powers. The second step relates to an analysis of the Commission's methodology and a determination of whether there is adequate evidence to support the Commission's findings. The third analysis looks to the substantive result of the Commission's order to see if it has arrived at a proper determination. This last analysis essentially incorporates the just and reasonable rate requirement set by our statute, W. Va. Code, 24-2-4, and more fully developed in *Hope Natural Gas Co., supra*, which we have adopted. It is the *Permian Base* standard of review that we apply to the present case.

## II. *THE GENERAL RATE FORMULA*

In this case we do not perceive that there is any real argument by the Company that the Commission has abused or exceeded its authority in the sense that its actions exceeded the broad regulatory duties entrusted to the Commission. Therefore, the first step analysis need not be discussed.

The controversy on this appeal centers on whether the second and third criteria have been met. With regard to the

---

[7] We have accorded the Commission considerable flexibility in its rate-making methodology. See the Syllabus of *Virginia Electric Power Co. v. Public Service Commission*, 161 W. Va. 423, 242 S.E.2d 698 (1978).

second criterion, the Company complains that the Commission's findings are contradictory and, thus, even while recognizing that it has broad authority to select particular methods for determining what is a reasonable and just rate, its interim and final orders do not reflect a reasoned result. The Company also complains that the new rates do not meet the third standard of permitting it to maintain financial integrity, attract the necessary capital and fairly compensate investors for the risks they have assumed. Because the new rates are a product of the separate components or the method of building the rate process, these two criteria are closely interrelated. In order to understand the detailed argument, some reference must be made to the general rate formula which governs the rate-making process.

The rate-making process essentially involves setting tariff rates or a schedule of charges that the utility's customers must pay. The total revenues derived from the tariff rates must be sufficient to cover the actual operating costs of the utility. In addition, the revenues must be sufficient to assure an adequate return on both the equity and debt capital of the business. This general rate-making process can be represented by the formula: $R = C + Ir$, where "R" is the total revenue earned by the Company through its tariff charges; "C" equals the utility's expected costs for goods and services, including taxes and depreciation during the period the prospective tariff rates are in effect; "I" represents the assets of the utility that are used but not consumed in the business ("I" is also known as the "rate base"); and the letter "r" is the reasonable rate of return allowed compositely on both debt and equity capital.[8] *See* Morgan, *Economic Regulation of Business* 219

---

[8] The rate of return on invested capital is generally determined by calculating the cost of both debt and equity capital. As to equity capital, i.e. common stock, an alternative to the cost approach is to ascertain a reasonable return based on capital earnings from comparable businesses. The amount or rate of return on both debt and equity capital is expressed as a percent. These rates are then multiplied by the percent ratio that equity and debt capital bear to total capital. The resulting figures are then added together to obtain the composite cost of capital—which is often called rate of return. This

(1976); Wilcox & Shepherd, *Public Policies Toward Business* 360 (5th ed. 1975); Phillips, *The Economics of Regulation* 129 (rev. ed. 1969); Wise & Baer, *Some Comments on Rate Making in West Virginia*, 57 W. Va. L. Rev. 33 (1955).[9]

## III. *REVIEW OF SPECIFIC CLAIMS*

### A. *The Earnings Question*

The Commission in its interim order stated that it was permitting the Company to increase its charges in order to generate $12.6 million in increased revenues, which would yield "$60 million in defined earnings."[10] Much the same

---

composite rate of return is then multiplied by the rate base to arrive at a dollar figure, which is the amount of return on invested capital. In the Commission's interim order, the allowed rates of return on debt and equity were:

|  | Percent to Total | Cost Rate | Weighted Cost |
|---|---|---|---|
| Long Term Debt | 56.7 | 8.07 | 4.59 |
| Preferred Stock | 10.9 | 7.18· | .78 |
| Common Equity | 32.4 | 13.05 | 4.23 |
| Overall cost of Capital | 100% |  | 9.6% |

[9] This law review article uses a similar formula where "R" is termed the total cost of service incurred by the utility and is defined as:
"This cost of service customarily is made up of four major factors: (1) operating expenses, (2) depreciation and depletion allowances for property consumed in providing service, (3) taxes, and (4) return to the investor for the use of his money computed by the rate base—rate of return formula." 57 W. Va. L. Rev. at 44.

[10] The pertinent portion of the interim order at p. 5 states:
"Today's order is designed to provide, when fully effective, approximately $24.5 million of internal cash for construction after dividends (including the new depreciation rates approved in Case No. 9450), so that with an average 1979-1980 construction program net of AFUDC of approximately $59 million, the cash generated by the rates approved herein is approximately 42% of such construction program on a West Virginia basis.

"In addition, on a West Virginia basis, our decision today is designed to generate approximately $60 million in defined earnings, so that with a West Virginia long-term debt responsibility at the current level of about $20.5 million, pretax long-term debt coverage is in the order of 2.9 times."

language is contained in the final order.[11]

The difficulty is that in neither order is there any analysis nor explanation as to how this level of "defined earnings" can be achieved nor any explanation of what constitutes "defined earnings." Both the interim and final orders contain a Schedule A which is a summary of the ultimate calculations showing the end result of the rate-making process.[12] We are at a loss to understand how the Commission's defined earnings statement can be understood. In the ordinary sense of the word, "earnings" are those amounts representing a return above the company's costs. Customarily, the "earnings" in the general rate formula is the rate of return on invested capital (r), which in both the interim and final orders is approximately $43.7 million and $43.9 million, respectively.

---

[11] The final order provides at p. 19:
"In addition, on a West Virginia basis, our decision today is designed to generate approximately 59.6 million in defined earnings so that with a West Virginia first mortgage bond interest responsibility at the current level of about $20.5 million, pretax long-term coverage is 2.9 times."

[12]

SCHEDULE A

| | Interim Order | Final Order |
|---|---|---|
| | Amount (000 Omitted) | Amount (000 Omitted) |
| | $ | $ |
| Rate Base | 455,142 | 456,954 |
| Return at 9.6% | 43,694 | 43,867 |
| Federal Income Tax | 10,847 | 10,294 |
| Operation and Maintenance Expenses | 119,851 | 115,747 |
| Depreciation and Amortization | 16,127 | 16,181 |
| Other Taxes | 18,611 | 16,083 |
| Total Cost of Service | 209,130 | 202,172 |
| Revenues Case 8809, Tier III Rates | 196,497 | 197,149 |
| Deficiency | 12,633 | 5,023 |

The "deficiency" is the difference between the estimated costs of operations plus the cost of capital (figured at 9.6% of the rate base) less the revenues generated from the Tier III rates existing from a prior rate case No. 8809.

It may well be that the Commission is utilizing the term "defined earnings" in a broader sense, but if it is, there is no elaboration of its meaning in the Commission's orders. We do not suggest that the Company is entitled to $60 million in earnings but only that it is not possible to determine what the Commission conceived was an appropriate level of earnings. It has failed to give an explanation of its methodology or terminology in regard to the "defined earnings" question and in particular how it relates to the actual projected earnings of $43.9 million allowed in the final order. For this reason, we consider the Commission's order defective in this respect.

A. *The Rate Base (I)*

As earlier discussed, the general rate-making formula envisions that, above the Company's costs, it is entitled to an earning increment, "Ir", which is a return on capital. In both the interim and final orders the Commission established the rate of return (r) at 9.6%. This rate of return is then multiplied by the Company's fixed assets or rate base (I). Obviously, the higher the value of the rate base the greater dollar value will be yielded when the rate of return is multiplied against it.

In this case, we are offered no explanation in the Commission's order as to how the rate base was calculated. The Commission did allow a $57 million increase in the Company's rate base in its interim order and we can only conclude that this was included in the rate base of $455,142,000 set in Schedule A.[13] Yet, in its final order, the Commission stated that it was including an additional $10 million in the rate base.[14] However, examining the rate base in Schedule A of the final order, we find it appears as $456,954,000 or only an approximate $800,000 increase in the rate base, not the announced $10 million increase. At the established rate of return of 9.6%, a $10 million increase in the rate base would generate an additional $960,000.

---

[13] See Note 12 as to the Schedule A figures.

[14] The applicable portion of the final order at p. 21 is:

"In recognition of Monongahela's financial situation, we will allow an additional $10 Million of CWIP in rate base, the total amount of CWIP allowed in rate base for this case is $67 million."

The order cannot be reconciled in this area and we are unable to determine upon what basis the Commission settled on the rate base in its final order. The rate base figure is a key component in the overall rate-making process, and because of this $10 million descrepancy, we are compelled to conclude that the Commission's final order does not meet our review standard since it does not contain any explanation of this apparent discrepancy.

## C. *Revenues at Going Level*

Both in the interim and final orders on Schedule A, the Commission has set the existing revenues of the Company based on revenues derived from a preceding rate case No. 8809, which are called the Tier III rates.[15] The Company claims at least as to the non-fuel costs, these existing revenues or rates are based on 1976 costs and do not reflect the increased costs arising from inflation since the 1976 test year utilized in case No. 8809.

We do not concur in the Company's position since the Tier III revenues are only being used as estimates of the present going level revenues of the Company. The cost figures on Schedule A of the current rate case represent cost estimates based on the 1977 test year and they have been adjusted for current cost estimates. The purpose that the Tier III revenues or rates serve in the present case is to establish a revenue level against which the current costs of the Company are measured, including the rate of return on capital. It is the difference between the Company's total costs and its current revenues that establish the amount of increase in revenues that are to be set in the revised tariff rates.

We do not, however, understand the Commission's use of Tier III revenues of $197,149,000 in Schedule A of the final order as the going level revenues. In footnote 1 of both the interim and final orders the Commission states that "its final order in Case No. 8809 . . . provided total annual Tier III revenues of $186,302,013." This $10 million discrepancy

---

[15] See Note 12, *supra* , where the Tier III rates are stated as $196,497,000 in the interim order and as $197,149,000 in the final order.

in going level revenue would have the effect of overstating the estimate revenue level in Schedule A which would result in a failure to cover a similar amount of the Company's anticipated costs. Again, the problem lies in the adequacy of the Commission's order which does not attempt any explanation of how the difference in the Tier III revenue was obtained.

## IV. *APPLICATION OF THE REVIEW STANDARD TO THE COMMISSION'S ORDERS*

We have earlier stated that an administrative decision requires that there be some reasoned explanation of the various rulings. The Commission should make a fuller explanation not only of the methodology it has adopted but some more detailed analysis of both the factual and legal issues. We sense that part of the problem in this case lies in the fact that the Commission dealt with a series of prior rate cases filed by the Company and, at least as to case No. 8809, it did not terminate until after the Company's new tariff was filed in the present case. As a consequence, the Commission had a great deal of familiarity with the Company's financial records and consequently handled its reporting of the present case in a somewhat abbreviated fashion.

The problem this Court has on review is that we have no such familiarity with the previous proceedings and consequently it is difficult to understand the Commission's orders. A more comprehensive opinion is the ultimate goal that we seek. We are aware that the Commission can produce a comprehensive order fully compatible with our review standard. *E.g., Re Chesapeake and Potomac Telephone Company of West Virginia,* 26 Pur.4th 29 (Docket Nos. 8890, 8969, W. Va. 1978); *Re Columbia Gas of West Virginia, Inc.,* 20 Pur.4th 204 (Case No. 8807, W. Va. 1977). Certainly, there are other models that Commission could follow which give a careful explanation of how the differences between the Company and Commission's staff are resolved and how the figures for the overall rate formula are determined. *E.g., Re: Connecticut Light and Power Co.,* 30 Pur.4th 67 (Docket Nos. 781206, 781207, Conn. 1979); *Re: Intermountain Gas Co.,* 30 Pur.4th 231 (Order No.

14859, Idaho 1979); *Re: Missouri Public Service Company*, 30 Pur.4th 145 (Case Nos. ER-79-60, GR-79-60, Mo. 1979); *Re: Southern Bell Telephone and Telegraph Co.*, 30 Pur.4th 263 (Order No. 79-90, S.C. 1979); *Re Appalachian Power Co.*, 30 Pur. 4th 54 (Case No. 19984, Va. 1979).

It is conceivable that the Commission could issue orders like it has in this case and await the Company's petition for rehearing which would serve to identify the critical points that the Company claims were adversely decided. Upon ruling on the petition for rehearing, the Commission could then go into greater detail as to the reasons for its challenged rulings by way of a written order or memorandum. This approach might serve to avoid any extensive discussion of minor issues and confine the fuller memorandum to those substantial issues which the Company may wish to appeal.

## V. *THE COMPANY'S RESPONSIBILITIES*

We do not overlook the Company's responsibilities in seeking an appeal from the Commission's rulings. It should be prepared to identify with particularity where the Commission's ruling precludes a fair overall rate of return. Part of the problem in the present case is that we are confronted with a generalized claim by the Company that the overall rate of return is confiscatory without any detailed showing in the briefs that supports this position. If the problem is partially the failure to adjust base year costs, these adjustments should be identified by amount so that a determination can be made as to the dollar value effect on the overall rate of return. The same is true of omissions from the rate base or claims of error on calculations of costs or return on capital. There is also need to pinpoint these errors by reference to the administrative record and more importantly to demonstrate that these errors were specifically assigned on the petition for rehearing.

An illustration of the problem is the construction work in progress (CWIP) issue. The Company obtained as a result of the Commission orders some $67 million in CWIP included in its rate base. Apparently, this was a marked departure

from the Commission's past practice which was to create an allowance for funds used during construction (AFUDC) account into which are accrued the amount of the costs of funds used in the construction work in progress. Normally these earnings, which are supposedly equivalent to the cost of funds raised for the construction (not the principal sum), are permitted to accumulate in the AFUDC account. In this sense, it is an income account but such earnings are "paper" only and do not enhance the cash flow. Ultimately, under the AFUDC method, when the facility is constructed it will be placed in the rate base along with the AFUDC account.

Despite what appears to be a favorable ruling for the Company by the Commission's placing $67 million of CWIP in the rate base,[16] the Company in its brief argues that this

---

[16] To attempt to summarize in one paragraph the complex accounting concepts of CWIP and AFUDC as they relate to rate making is virtually impossible and serves to illustrate perhaps why there is a need for some elaboration of these matters by both the Commission in its orders and by the Company on its appeal. Most commentators seem to agree that the Company benefits by allowing CWIP to be accrued into the rate base. E. Mattutat in *A Pragmatic Approach to Construction Work In Progress*, 99 Pub. Utility Fort. 31, 37, March 3, 1977, lists these advantages:

"In conclusion, when considering CWIP in rate base, there is a number of factors to be weighed, some of which are advantageous to the company and others which are in the overall best interests of the ratepayers. Among these factors are the following:
  "1) Improved cash flow
  "2) Improved quality of earnings by elimination of all or part of AFUDC
  "3) Improved coverages
  "4) Reduced financing requirements
  "5) Gradual rate increases
  "6) Prospect of reduced property taxes
  "7) Improved bond ratings or the maintenance of existing ratings"

*E.g.*, Hyde, *A Compromise on Construction Work In Progress Would Benefit Consumers and Investors*, 100 Pub. Utility Fort. 15, August 18, 1977; Fitzpatrick and Stitzel, *Capitalizing on Allowance for Funds Used During Construction: The Impact on Earnings Quality*, 101 Public Utility Fort. 18, January 19, 1978; Nash, *Rate Relief and the Construction Funds Allowance—A Big Dollar Question*, 102 Public Utility Fort. 15, July 6, 1978; Bunch, *The Tax Effects of AFUDC:*

has damaged its financial condition. We are presented with no explanation by the Company on this point.[17] Consequently, not only are we unable to analyze the issue but such a presentation seriously undermines the credibility of the Company's overall position on appeal.

A similar difficulty occurs when the Court examines the Company's argument that its historic return on equity capital, as actually earned, is less that the amount permitted or set by the Commission in previous rate cases. We are aware that the Massachusetts court has on several occasions dealt with this question. *E.g., New England Telephone & Telegraph v. Department of Public Utilities,* 371 Mass. 67, 354 N.E.2d 860 (1976); *Boston Gas Company v. Department of Public Utilities,* 359 Mass. 292, 269 N.E.2d 248 (1971). However, in those cases, the Company made a specific record, through expert testimony, detailing the exact nature of the causes creating the historic deficiencies between the actual rate of return and the rate of return set by the Commission. In *New England Telephone,* the court found the Company's position was uncontradicted and that the decline in actual rate of return was a result of "attrition," defined as,

> "the tendency of rate of return to diminish in a period of comparatively high construction costs. In times of inflation, as old plant is retired, the new plant built to replace it costs more. If investment increases more rapidly than revenues, the rate of

*Financial Accounting Aspects,* 106 Public Utility Fort. 26, August 14, 1980.

[17] The Company's brief of 6/23/80, p. 7, Note 1, contains this statement in commenting on the inclusion of CWIP into the rate base: "On the surface, it seems as if the Commission has done something extra 'in order to improve the company's financial statute' and that such an effect should be commended. We *do* commend what the Commission *says*. In fact, however, the result of this apparently beneficial step, is eventually to *reduce* the Company's reported earnings and hence even further *impair* its financial status. By now (since the subject has been discussed at length in the Company's presently-pending rate case), the Commission may understand this. We will not burden the Court with the matter further at this point." (Emphasis in original)

return is diminished." (citations omitted) 371 Mass.
at 72, 354 N.E.2d at 864.

In this case, we are not presented with a specifically developed expert record which demonstrates "attrition." Nor did the Company assert the "attrition" issue in its petition for rehearing before the Commission. Therefore, we decline to address this issue.

## VI. *CONCLUSION*

We conclude that because of the inadequacy of the Commission's explanation surrounding the company's "defined earnings," the apparent discrepancy of approximately $9.2 million in the Company's rate base in West Virginia and the problem involving the amount of the Tier III revenues from Case No. 8809, this case will be remanded for further clarification of these points. This is the procedure that other courts have adopted when the Commission's order contains inadequate findings. *Cerro Copper Products v. Illinois Commerce Commission*, 76 Ill.App.3d 230, 394 N.E.2d 1084 (Ill. App. 1979); *United Telephone Co. of Indiana, Inc. v. Public Service Commission*, 402 N.E.2d 1013 (Ind. App. 1980); *Gas Service Co. v. State Corporation Commission*, 4 Kan. App.2d 623, 609 P.2d 1157 (1980); *General Telephone Co. v. Public Utilities Commission*, 30 Ohio St.2d 271, 285 N.E.2d 34 (1972).

In ordering the remand, we wish to make it clear that the remand is for the purpose of clarification of the three specific areas that we have discussed in this opinion. We do not believe that additional testimony will be necessary nor that the Company is entitled to reopen the case or argue new points. We do not foreclose, however, authority to the Commission to modify its original order if upon further consideration it deems that such action is appropriate.

*Remanded*

Justice Caplan participated and concurred in this decision but departed from the Court prior to the

preparation of the opinion. Justice McHugh did not participate in the consideration of this case.

NEELY, CHIEF JUSTICE, *Concurring:*

I concur in the result reached by the majority that this case should be remanded for further development; however, I feel that this opinion may contribute to proper development on remand. The circumstantial evidence in this case of an inadequate rate of return to the utility is so compelling that I believe that the Commission will have little choice but to avail itself of the opportunity suggested at the conclusion of the majority opinion to modify its order.

I have very few illusions about my own limitations as a judge and from those limitations I generalize to the inherent limitations of all appellate courts reviewing rate cases. It must be remembered that this Court sees approximately 1,262 cases a year with five judges. I am not an accountant, electrical engineer, financier, banker, stock broker, or systems management analyst. It is the height of folly to expect judges intelligently to review a 5,000 page record addressing the intricacies of public utility operation. As we have implied in *Virginia Electric and Power Co. v. Public Service Commission,* 161 W.Va. 423, 242 S.E.2d 698 (1978), cited with approval in *Virginia Electric & Power Co. v. Public Service Commission,* 161 W.Va. 423, 248 D.R.2f 322 at 327 (1978), the one critical result which courts can understand and the only thing which they need address is the constitutionality of the utility's rate of return on its invested capital. Courts are indispensable to the health of regulated industries in this regard since they are expected to be uninfluenced by political considerations which may cloud the judgment of elected officials and their political appointees. Certainly a public utility has as much right under the Fourteenth Amendment to the *Constitution of the United States* and *W. Va. Const.,* art III, § 10 not to have its property confiscated as the lowliest welfare client.

## I.

It is to the issue of confiscation that the public utility has addressed itself in its presentation of the case before us;

unfortunately, that was not the thrust of the utility's case below so that the evidence in support of their position is very raw. Nonetheless the utility has enough evidence to create serious concern for its continued solvency. The historic rate of return to equity stockholders from 1971 to 1979 is depicted in the graph below:

Facts supporting that graph were introduced into evidence by the utility and the graph was made a part of the utility's brief. On reargument before this Court on 12 November 1980 I asked counsel for the Public Service Commission whether the Commission would stipulate that the graph is accurate and counsel said that while the Commission would not stipulate its accuracy, the Commission did not assert that it was inaccurate. The dotted line which shows a decline from 1979 to 1980 is the utility's estimation of the probable further decline for the year 1980 and there is

nothing in the record before us to indicate that the utility's prediction is not substantially accurate.

It is upon these figures which show a consistent decline from an 11.9 percent rate of return to equity in 1974 to a 7.4 percent rate of return to equity in 1979 that the utility may have made its case. As we shall see below, however, there is some question about what the utility has included in its rate base to arrive at these figures; the Commission's expert testimony is at odds with these figures but not sufficiently developed to be persuasive. The testimony of neither utility nor commission witnesses discusses the methodology employed to determine the rate base upon which the rate of return was calculated although there is random discussion of the rate base. Consequently, the factors to which I am looking are not the exact figures submitted by the utility, but rather the trend. If there were *consistent* miscalculations in the determination of the proper rate base, the best case for the Commission would merely move the entire trend line upward and to the right, leaving the downward thrust intact.

While the utility may have included some questionable items in its rate base, such as construction works in progress, nonetheless, we can reasonably assume that whatever accounting conventions were used have been used consistently. Accordingly, it is the consistent downward slope through good years and bad which demonstrates a questionable system of rate regulation. The most salient feature of the utility's graph is that it *does not* show positive and negative fluctuations around an acceptable mean; quite to the contrary, it shows a six year course of consistent decline. Some of this decline may be attributable to a year by year increase in attrition along with a constantly expanding requirement for construction for new capacity; however, as we shall see when the market value of the parent's stock is discussed, there appears to be no general expectation outside the Commission that this company will ever harvest a reasonable profit from its current construction. That implies that any accounting

explanation for a low rate of return is somewhat ingenuous.

## II

The legal guidelines which have long been established criteria for determining the reasonableness of rate of return have rarely been used to overturn a regulatory decision on the basis of unreasonable rate of return. Under *Bluefield Water Works & Improvement Co. v. West Virginia Public Service Comm'n*, 262 U.S. 679 (1923) and *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591 (1944), the return must be sufficient to: (1) maintain confidence in the financial integrity of the enterprise, (2) maintain the credit of the enterprise, and, (3) attract capital to the enterprise by affording it an earning opportunity commensurate with returns on investments in other enterprises having corresponding risk. More recently, the United States Supreme Court announced its rules for review of administrative appeals in *Permian Basin Area Rate Cases*, 390 U.S. 747 (1968) which is reflected in the majority's syl. pt. 2. There is serious concern on my part whether the old guidelines or the *Permian Basin* guidelines have been met as will become apparent when we discuss: (1) the market value of the parent company's stock (which is significantly below book value); (2) the downgrading of Monongahela's bond rating; and, (3) the substantiated allegations that the method of arriving at rates through the use of an unrealistic test year will always put real rates behind systemic inflation.

## A

If the utility were suffering from only the effects of an adverse business climate on a casual basis, it would be proper for the Commission to conclude that the utility, like any other private business, must be ready to accept good and bad years in response to fluctuations in demand for its particular product. Notwithstanding the eloquent arguments of the Commission that Monongahela's poor performance is attributable to such factors as decreased

sales to other utilities, the record does not show that the alleged confiscatory return to equity in the case before us emanates primarily or even substantially from the nature of demand. Even if all of the conclusions of the Commission about a decline in profit attributable to reduced sales were true, the utility calculated rate of return for 1979 would increase from 7.4 percent to only 8.4 percent, and upon oral argument, in response to my questions, the Commission did not challenge that the change would be of that general order of magnitude.

While there may be a short run advantage to consumers to maintaining confiscatory rates for public utilities it is certainly not to their long run advantage. According to undisputed testimony, Moody's Bond Service recently downgraded the bonds of the Monongahela Power Co. from A to Baa. It should be obvious even to a novice that the downgrading of bonds by a rating service implies higher rate of interest for borrowed, fixed obligation securities, which must ultimately be absorbed by consumers.

The utility has made a persuasive case that it is unable to raise capital because of: (1) its inability to provide adequate "coverage" for either bonds or preferred stock; and, (2) its inability to pay dividends on common equity. No new bonds can be issued unless the annualized aggregate interest on existing first mortgage bonds plus the anticipated annualized interest on the proposed new issue bonds is "covered" twice by earnings as defined in the utility's indenture.[1] According to a chart submitted by the utility to which the Commission stipulated in principle (assuming the mathematics were correct) the company is currently unable to issue $50 million of new bonds because its coverage will not support the issue.

Furthermore, even when the company is legally in a position to issue first mortgage bonds under its indenture,

---

[1] Under section 79(f) of Title 15 of the Public Utility Company Act of 1935, no company subject to the provisions of the Act shall issue or sell its first mortgage bonds or preferred stock except in accordance with a "declaration" as that term is defined elsewhere in the Act.

that legal ability does not dictate the cost of capital. The amount of money which can be raised is some direct negative function of the interest rate since as the cost of capital increases in response to rating service downgrading, the amount of bonds which can legally be issued under existing coverage decreases. Preferred stock also has coverage restrictions, in this instance a one and one-half coverage requirement; therefore, earnings must be one and one-half times annualized interest costs and annualized dividends on existing preferred stock plus the annualized dividends on the proposed preferred stock before the proposed preferred stock can be issued. The mere existence of legal coverage, however, does not determine whether the market will accept the new issue or at what cost.

Finally, we come to common equity. The Monongahela Power Company is a wholly-owned subsidiary of the Alegheny Power System; therefore, Monongahela's only source of equity financing is the parent company. Allegheny Power cannot invest equity capital in Monongahela unless it raises equity capital itself and Allegheny can only raise equity capital by selling its own common shares. It should be obvious that Allegheny cannot issue common equity without supporting it by dividends and it can pay dividends only from funds which it receives as dividends from its operating subsidiaries. Furthermore, from the perspective of consumers of electric power in West Virginia there is a need to assure that the company will be able to raise the necessary capital to meet projected increased demands for electricity.[2]

<hr>

[2] Our own Public Service Commission advised the Legislature in its *1980 Report to the West Virginia Legislature; Electric Supply and Demand Balance,* 1979-1989, that:

Of all the major electric utilities located in this State, MPCO [Monongahela] and PECO [Potomac Edison Company] have the worst outlook regarding their capability to serve their projected load. With the present load and capacity projections and if any generations outages occur during peak load, *APS will not be capable of providing from its own generation the total power requirements of its customers* during the period 1984 through 1987. After that period, APS's ability to supply their customers' loads

## B

The thrust of the utility's complaint is that the method by which the Public Service Commission sets rates is entirely unrealistic and will not only deny the utility a fair rate of return in this case, but will also deny it a fair rate of return for the foreseeable future. The utility maintains that setting rates by reference to a test year (in the case before us the year 1977) leads to inherently absurd results because inflation makes the figures developed by reference to a test year obsolete immediately.

This Court cannot, of course, become involved in the accounting mechanics of rate setting; however, the evidence before us, tied as it is to rate of return, presents a persuasive body of circumstantial evidence that the Commission is doing something very wrong. While I would not presume to discuss the mechanics of rate setting, I think that the circumstantial evidence which follows is

will depend on when and if it is successful in installing the Lower Armstrong, David Hydro and subsequent units. Should APS not be able to install this generation at the projected 'in-service' dates, *the power supply to the northern two-thirds of the State will be very precarious."* (Emphasis supplied).

The financial instability of electric utilities has recently become a source of ever greater national concern. Some observers warn that the unprecedented and once thought impossible may occur: a major U.S. utility could fall into bankruptcy. The greatest problem facing electric utilities is unquestionably the soaring cost of construction which has grown astronomically in recent years. At the same time the average utility's ability to generate money internally has dropped steadily. While utilities have traditionally paid large dividends from net income and cash earnings, they are now forced to rely on other sources, such as a depreciation fund or bank borrowing. Another problem is that the portion of net income which is designated as allowance for funds used during construction (AFUDC) has grown rapidly. While AFUDC is a perfectly acceptable accounting principle, it doesn't help utilities pay bills and it pushes up apparent earnings which increase consumer resistance to higher rates.

The loss in confidence by investors in public utilities is best reflected in the drop in their credit rating. While in 1970 only 4% of the electric utilities received the lowest investment grade rating, today fully 30% of the electric utilities have received the lowest grade from Standard & Poor's. For a discussion in more detail, see Emshwiller, "Big Financial Problems Hit Electric Utilities, Bankruptcies Feared", Wall St. J., Feb. 2, 1981 at p. 1, col. 6.

sufficient to require further inquiry and explanation concerning the Commission's procedures, since the circumstantial evidence indicates that the Commission is in substantial error. In this regard the Commission's own expert witness filed the following chart for the Allegheny Power System which demonstrates that consistently since 1974 the price per share of Allegheny Power System stock has been significantly below the book value:

ALLEGHENY POWER SYSTEM, INC.
INDICATORS OF COST OF CAPITAL

| Line No. | Description | 1978 | 1977 | 1976 | 1975 | 1974 | 5 Year Average |
|---|---|---|---|---|---|---|---|
| 1 | Earnings Per Share ($) | 1 90(1) | 2.28 | 2 18 | 2 32 | 1.76 | |
| 2 | Dividend Per Share ($) | 1.72 | 1.69 | 1.62 | 1 54 | 1.52 | |
| 3 | Book Value Per Share ($) | 20 54(2) | 20.43 | 19 95 | 19 49 | 18.78 | |
| 4 | Market Value Per Share ($) | 18.27(3) | 21.08 | 19.19 | 16.59 | 16.67 | |
| 5 | Earnings/Book Value (%) | 9.25 | 11.16 | 10.93 | 11 90 | 9 37 | 10.52 |
| 6 | Earnings/Market Value (%) | 10.40 | 10 82 | 11.36 | 13.98 | 10 58 | 11.43 |
| 7 | Average Annual Dividend Yield (%) | 9.41 | 8.02 | 8.44 | 9.28 | 9 12 | 8.85 |
| 8 | Dividend Payout Ratio (%) | 90.53 | 74.12 | 74 31 | 66 38 | 86 36 | 78.34 |
| 9 | Market Value/Book Value (%) | 88.95 | 103.18 | 96.19 | 85.12 | 88.78 | 92.44 |
| 10 | Average Number of Common Shares Outstanding (000) | 38,483 62(1) | 30,928.02 | 30,256.71 | 27,292 23 | 26,894 97 | |

While the commission expert did point out that Monongahela Power performed significantly better than other companies in the Allegheny system, nonetheless, it should be obvious that if Allegheny issues new equity capital at a sales price less than book value, the effect is to reduce the equity of existing shareholders since the new shareholders are buying in at almost fire sale prices.

Since a public utility has an obligation to serve the public, existing shareholders are in imminent danger of having their property confiscated through no process other than the utility's moral obligation to raise equity capital to finance capacity needed by the public. From a reading of the exhibits submitted by both the Commission's staff and the utility I am, quite frankly, unable to determine the

extent to which the performance of the Monongahela Power Company bears responsibility for the inadequate price of Allegheny Power System shares. If upon remand it can be demonstrated that Monongahela Power Company's performance does not contribute to the poor performance of the parent's stock, then, obviously, West Virginia has no obligation to compensate for inadequacies in either Ohio or Pennsylvania.

The testimony of the Commission's staff and experts would lead me to believe that the Commission's criteria for a fair rate of return are erroneous since the staff consistently asserts that the standard is the rate of return of other regulated utilities. No reasonable political economist would accede to the proposition that one regulated enterprise should be judged by reference to another regulated enterprise. That criterion would quickly lead us down the path to Alice's Wonderland. Certainly the rate of return allowed other power companies is one element to be considered, but the primary criterion must be the rate of return earned by large companies in the unregulated, market economy engaged in the manufacture of a product for which there is a stable demand. This is almost the definition of "fairness" because investors are entitled to the same return in a regulated industry that they would receive for a comparable risk in the unregulated sector. In this regard it is difficult to find a perfect market sector model for rate making purposes; nonetheless, a composite model can be constructed with skillful econometrics using available statistical material. Otto Eckstein at Harvard has made his reputation doing such things. It is eminently unfair to the utility to be judged by the standard of other utilities since the preeminent risk shared by all public utilities is political and not economic, the exact risk against which public service commissions and courts are expected to insure.

Since the Commission's staff cited to the *Value Line Investment Survey* in the preparation of its testimony, I take the liberty of pointing to the chart below which is

*Value Line's* list of high yielding stocks published 16 January 1981:

## HIGH YIELDING STOCKS (Based upon estimated year-ahead dividends per share)

| Page No. | Stock Name | Recent Price | Time liness | Safety Rank | P/E Ratio | Current Percent Ext'd Yield | Industry Group | Industry Rank |
|---|---|---|---|---|---|---|---|---|
| 1202 | FREE STATE GED ADR (g) | 58 | – | 4 | 5.4 | 20.0% | GOLD/DIAMOND (S.A.) | – |
| 1206 | WESTERN HOLDINGS (g) | 87 | – | 4 | 4.6 | 19.9% | GOLD/DIAMOND (S.A.) | – |
| 1199 | BLYVOOR GOLD ADR(g) | 18 | – | 4 | 5.0 | 19.2% | GOLD/DIAMOND (S.A.) | – |
| 1204 | WEST DRIEFONTEIN (g) | 91 | – | 4 | 5.9 | 17.5% | GOLD/DIAMOND (S.A.) | – |
| 1219 | GT NORTHERN IRON | 24 | 3 | 3 | 5.7 | 16.7% | METALS & MINING(GENERAL) | 84 |
| 1205 | WESTERN DEEP L2Y (g) | 64 | – | 4 | 6.7 | 15.3% | GOLD/DIAMOND (S.A.) | – |
| 185 | CEN MAINE POWER | 12 | 3 | 4 | 6.4 | 14.5% | ELECTRIC UTILITY (EAST) | 78 |
| 1203 | KLOOF GOLD MNG ADR (g) | 38 | – | 1 | 7.6 | 14.5% | GOLD/DIAMOND (S.A.) | – |
| 707 | COMMONWEALTH EDISON | 19 | 3 | 1 | 5.6 | 14.2% | ELECTRIC UTIL (CENTRAL) | 67 |
| 211 | UNITED ILLUMINATING | 20 | 3 | 2 | 5.7 | 14.0% | ELECTRIC UTILITY (EAST) | 78 |
| 139 | DUQUESNE LIGHT | 13 | 3 | 2 | 7 | 13.8% | ELECTRIC UTILITY (EAST) | 78 |
| 743 | UNION ELEC. | 11 | 3 | 1 | 5.4 | 13.8% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 1174 | MASS.MUTUAL MTG/RLTY | 13 | 3 | – | 7.3 | 13.7% | REIT | 39 |
| 209 | SOUTHERN CO | 12 | 3 | 1 | 5.2 | 13.7% | ELECTRIC UTILITY (EAST) | 78 |
| 190 | SOUTHERN UTIL ASSOC | 12 | 3 | 2 | 6.9 | 13.6% | ELECTRIC UTILITY (EAST) | 78 |
| 724 | KANSAS GAS & ELEC. | 15 | 3 | 3 | 5.2 | 13.6% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 728 | MIDDLE SOUTH UTILITIES | 12 | 3 | 3 | 5.6 | 13.6% | ELECTRIC UTIL (CENTRAL) | 67 |
| 734 | OHIO EDISON | 13 | 3 | 2 | 8.8 | 13.5% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 182 | BOSTON EDISON | 21 | 3 | 3 | 5.0 | 13.4% | ELECTRIC UTILITY (EAST) | 78 |
| 709 | DAYTON POWER & LT | 13 | 3 | 3 | 6.9 | 13.3% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 712 | EMPIRE DIST. ELEC. | 11 | 3 | 3 | 5.9 | 13.4% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 1731 | PORTLAND GENERAL ELEC. | 13 | 3 | 3 | 5.8 | 13.4% | ELECTRIC UTILITY (WEST) | 85 |
| 710 | DETROIT EDISON | 12 | 3 | 3 | 6.5 | 13.3% | ELECTRIC UTIL (CENTRAL) | 67 |
| 205 | PUBLIC SER (N.H.) | 16 | 3 | 3 | 6.4 | 13.3% | ELECTRIC UTILITY (EAST) | 78 |
| 212 | VA. ELEC & POWER | 11 | 3 | 2 | 5.9 | 13.3% | ELECTRIC UTILITY (EAST) | 78 |
| 187 | DELMARVA POWER & LT | 12 | 3 | 2 | 6.6 | 13.2% | ELECTRIC UTILITY (EAST) | 78 |
| 715 | ILLINOIS POWER | 18 | 3 | 1 | 6.3 | 13.2% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 723 | KANSAS CITY POWER & LT. | 21 | 3 | 3 | 5.2 | 13.2% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 2052 | LOMAS & NETTLETON MTG | 18 | 4 | 3 | 4.8 | 13.2% | REIT | 39 |
| 204 | PUBLIC SER. ELEC. & GAS | 15 | 3 | 2 | 5.2 | 13.2% | ELECTRIC UTILITY (EAST) | 78 |
| 183 | CAROLINA POWER & LT | 18 | 4 | 2 | 6.0 | 13.1% | ELECTRIC UTILITY (EAST) | 78 |
| 708 | CONSUMERS POWER | 8½ | 4 | 4 | 6.6 | 13.1% | ELECTRIC UTIL (CENTRAL) | 67 |
| 199 | NORTHEAST UTILITIES | 14 | 4 | 3 | 5.7 | 13.1% | ELECTRIC UTILITY (EAST) | 78 |
| 1291 | EAST DRIEFONTEIN GOLD(g) | 32 | – | 4 | 7.4 | 13.0% | GOLD/DIAMOND (S.A.) | – |
| 738 | NIAGARA MOHAWK | 15 | 3 | 2 | 6.3 | 13.0% | ELECTRIC UTILITY (EAST) | 78 |
| 738 | ST JOSEPH LT & POWER | 9½ | – | 3 | 6.1 | 13.0% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 208 | SOUTH CAR ELEC & GAS | 11 | 3 | 3 | 6.7 | 13.0% | ELECTRIC UTILITY (EAST) | 78 |
| 706 | CEN ILLINOIS PUB SER | 11 | 3 | 2 | 6.0 | 12.9% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 735 | OKLAHOMA GAS & ELEC. | 13 | 3 | 2 | 6.4 | 12.9% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 201 | PENN. POW'R & LT. | 17 | 3 | 1 | 6.1 | 12.9% | ELECTRIC UTILITY (EAST) | 78 |
| 207 | SAVANNAH ELEC. & POWER | 9½ | – | 3 | 5.2 | 12.9% | ELECTRIC UTILITY (EAST) | 78 |
| 742 | TOLEDO EDISON | 17 | 3 | 3 | 6.7 | 12.9% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 718 | IOWA ELEC. LT. & POWER | 13 | 3 | 2 | 5.4 | 12.8% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 194 | LONG ISLAND LIGHTING | 15 | 4 | 3 | 6.0 | 12.8% | ELECTRIC UTILITY (EAST) | 78 |
| 2097 | DREXEL BOND-DEB | – | – | – | NMF | 12.7% | INVESTMENT COMPANY | 17 |
| 719 | IOWA-ILL. GAS & ELEC. | 15 | 3 | 2 | 5.3 | 12.7% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 727 | LOUISVILLE GAS & ELEC. | 17 | 3 | 1 | 5.6 | 12.7% | ELECTRIC UTIL (CENTRAL) | 67 |
| 179 | AMER ELEC POWER | 18 | 3 | 2 | 7.3 | 12.6% | ELECTRIC UTILITY (EAST) | 78 |
| 184 | CEN HUDSON G. & E. | 18 | 3 | 3 | 5.6 | 12.6% | ELECTRIC UTILITY (EAST) | 67 |
| 713 | GULF STATES UTIL. | 12 | 3 | 3 | 5.8 | 12.6% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 726 | KENTUCKY UTILITIES | 17 | 3 | 2 | 7.5 | 12.6% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 1176 | NORTHWEST MUTL LIFE MTG | 9½ | – | 4 | 7.8 | 12.6% | REIT. | 39 |
| 1735 | SAN DIEGO GAS & ELEC | 13 | 4 | 3 | 12.1 | 12.6% | ELECTRIC UTILITY (WEST) | 85 |
| 178 | ALLEGHENY POWER SYS | 15 | 3 | 2 | 6.1 | 12.5% | ELECTRIC UTILITY (EAST) | 78 |
| 181 | BALT. GAS & ELEC. | 21 | 3 | 1 | 5.4 | 12.5% | ELECTRIC UTILITY (EAST) | 78 |
| 705 | CINCINNATI GAS & ELEC | 17 | 3 | 1 | 6.3 | 12.5% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 1173 | HUBBARD REAL EST. INV | 16 | 3 | – | 7.9 | 12.5% | REIT | 39 |
| 732 | NORTHERN IND P S | 12 | 3 | 4 | 6.6 | 12.5% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 200 | ORANGE & ROCKLAND UTIL | 13 | 3 | 3 | 6.5 | 12.5% | ELECTRIC UTILITY (EAST) | 78 |
| 1729 | PACIFIC GAS & ELEC | 22 | 3 | 1 | 6.2 | 12.5% | ELECTRIC UTILITY (WEST) | 85 |
| 2094 | AMER GEN'L BOND FUND | 17 | – | 3 | NMF | 12.4% | INVESTMENT COMPANY | 17 |
| 703 | CEN ILLINOIS LIGHT | 14 | 3 | 1 | 6.4 | 12.4% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 1728 | NEVADA POWER | 20 | 3 | 5 | 7.3 | 12.4% | ELECTRIC UTILITY (WEST) | 85 |
| 737 | PUBLIC SER (INDIANA) | 21 | 4 | 3 | 5.9 | 12.4% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 1726 | IDA-O POWER | 21 | 4 | 3 | 6.4 | 12.3% | ELECTRIC UTILITY (WEST) | 85 |
| 1732 | PUBLIC SER (COLO.) | 14 | 3 | 3 | 7.3 | 12.3% | ELECTRIC UTILITY (WEST) | 85 |
| 743 | HACKENSACK WATER | 18 | 3 | 3 | 8.4 | 12.3% | WATER UTILITIES | 85 |
| 2100 | HANCOCK (JOHN) INV | 16 | – | – | NMF | 12.2% | INVESTMENT COMPANY | 17 |
| 717 | INTERSTATE POWER | 13 | 3 | 3 | 7.2 | 12.2% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 2104 | MONTGOMERY ST INC SEC | 16 | – | – | NMF | 12.2% | INVESTMENT COMPANY | 17 |
| 203 | POTOMAC ELEC POWER | 13 | 3 | 1 | 5.9 | 12.2% | ELECTRIC UTILITY (EAST) | 78 |
| 206 | ROCHESTER GAS & ELEC. | 13 | 3 | 3 | 6.1 | 12.1% | ELECTRIC UTILITY (EAST) | 78 |
| 1727 | ARIZONA PUBLIC SER | 11 | 3 | 3 | 6.4 | 12.1% | ELECTRIC UTILITY (WEST) | 85 |
| 180 | ATLANTIC CITY ELEC | 17 | 3 | 2 | 6.3 | 12.1% | ELECTRIC UTILITY (EAST) | 78 |
| 1709 | UTAH POWER & LIGHT | 17 | 3 | 1 | 6.9 | 12.1% | ELECTRIC UTILITY (WEST) | 85 |
| 2105 | MUTL OF OMAHA INT SH | 12 | – | – | NMF | 12.0% | INVESTMENT COMPANY | 17 |
| 1734 | N Y STATE ELEC & GAS | 14 | 3 | 1 | 5.6 | 12.0% | ELECTRIC UTILITY (EAST) | 78 |
| 1734 | PUGET SOUND POWER & LT | 11 | 3 | 3 | 6.9 | 12.0% | ELECTRIC UTILITY (WEST) | 85 |
| 736 | TUCSON ELEC PWR | 14 | 2 | 3 | 5.7 | 12.0% | ELECTRIC UTILITY (WEST) | 85 |
| 513 | WASHINGTON GAS LIGHT | 22 | 3 | 3 | 6.7 | 12.0% | NATURAL GAS | 68 |
| 721 | IOWA RESOURCES | 18 | 3 | 2 | 7.9 | 12.0% | ELECTRIC UTILITY (WEST) | 85 |
| 368 | EQUIFAX, INC. | 21 | 3 | 3 | 7.0 | 12.0% | INDUSTRIAL SERVICES | 9 |
| 191 | FLORIDA POWER | 14 | 3 | 3 | 6.2 | 11.9% | ELECTRIC UTILITY (EAST) | 78 |
| 736 | OTTER TAIL POWER | 14 | 2 | 3 | 7.0 | 11.9% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 1730 | SIERRA PACIFIC POWER | 16 | 3 | 3 | 6.5 | 11.9% | ELECTRIC UTILITY (WEST) | 85 |
| 721 | IOWA RESOURCES | 23 | 3 | 3 | 6.1 | 11.9% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 1737 | SOUTHERN CAL EDISON | 26 | 3 | 4 | 6.3 | 11.8% | ELECTRIC UTILITY (WEST) | 85 |
| 467 | BROOKLYN UNION GAS | 13 | 3 | 2 | 5.2 | 11.7% | NATURAL GAS | 68 |
| 1171 | EL PASO ELEC CO | 9½ | – | 2 | 5.0 | 11.7% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 1171 | EQUITABLE LIFE MTG. | 12 | – | 3 | 12.0 | 11.7% | REIT. | 39 |
| 1725 | HAWAIIAN ELEC. | 24 | 3 | 3 | 5.8 | 11.7% | ELECTRIC UTILITY (WEST) | 85 |
| 481 | INDIANA GAS CO | 24 | 3 | 1 | 4.8 | 11.7% | NATURAL GAS | 68 |
| 716 | INDIANAPOLIS PWR & LT. | 13 | 3 | 1 | 5.3 | 11.7% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 720 | IOWA PUBLIC SERVICE | 19 | 3 | 3 | 5.9 | 11.7% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 722 | IOWA SO. UTILITIES | 21 | 3 | 3 | 5.3 | 11.7% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 725 | KANSAS POWER & LT | 18 | 3 | 2 | 5.3 | 11.7% | ELECTRIC UTIL. (CENTRAL) | 67 |
| 196 | NEW ENG GAS & ELEC. | 15 | 3 | 2 | 5.0 | 11.7% | ELECTRIC UTILITY (EAST) | 78 |
| 479 | GAS SERVICE CO | 11 | 3 | 2 | 7.2 | 11.6% | NATURAL GAS | 68 |

It is interesting to observe that with the exception of South African companies, almost all of the highest yielding stocks are public utilities. For the reader who is unfamiliar with the stock market, this means that the *value of the stock* is among the lowest in America as a multiple of dividends. In other words utility stock has been a poor performer as a long term investment. High yield usually means that the stock market is compensating for the stocks' lack of attractiveness in terms of growth, product innovation, or future profits attributable to other factors; in other words, it takes a very high current pay out to attract stock buyers since the long term prospects for higher profits are so dismal. In general institutional investors consider utility stock a sucker's bet.

One explanation of the current high yields is that utility stock tends to reflect the movement of the bond market (thus when interest rates are high the value of the stock is low). While the argument that the value of utility stocks will always move in an inverse direction from interest rates sounds eminently reasonable, that does not account for the fact that when interest rates were comparatively low from 1974 to 1976 the stock of Allegheny Power, the parent utility, still sold well below book value. If the argument is made that when all stocks do badly, as was the case from 1974 to 1977, utilities will also suffer, then there is no logic at all to the first proposition that utility stocks move with the bond market since when the stock market was low during those years the bond market was thriving. Those who argue that a low stock price is a normal risk to private enterprise which has no relation to an unfair rate of return must elect upon which theory they wish to proceed, but they cannot proceed on inconsistent theories simultaneously. It is not pure accident that utilities in general share the same page in *Value Line* with South African companies. Both utilities and South African companies suffer from political risk, by far the most threatening of all risks which can be borne by business. When the maintenance of low utility rates is an urgent item on political agendas throughout America it is hardly good methodology to use one confiscatory utility rate to determine another.

## C

Notwithstanding that I believe that the utility has made a good circumstantial case, it does not appear that upon the current record the utility has conclusively demonstrated anything other than a likelihood of confiscation. On remand, however, the Public Service Commission and the utility should explore what an appropriate "fair rate of return" is in this economy and the methodology by which that figure can be developed. Furthermore, it has always been admitted that the actual performance of a public utility may fall below the fair rate of return allowed by the Public Service Commission if such decline is the result of bad management, peculiar economic conditions of short duration, or an ill-advised investment decision. There is, as indicated earlier, evidence in the record that part of the poor performance of the utility is attributable to lack of demand by other power systems for surplus power which Monongahela expected to generate and sell. This may be a risk which should legitimately be borne by the utility, but that is only the case if the Commission concludes that in a year when the company sells in excess of the amount of power expected it will be entitled to keep the profits. Previous cases in this Court for which there are no reported opinions because petitions for review were not granted instruct my understanding that the Commission is most parsimonious in allowing utilities any windfall profits. The cases which leap to mind concern certain tax credits which Commission required to be passed through to consumers. Certainly in light of the Commission's care in determining that all reductions in cost should be passed on immediately to consumers, the argument that utilities must bear all the consequences of a poor economy are a little ingenuous. I voted to deny review to the utilities in the cases I recall because the Commission's policy seemed reasonable; that policy still seems reasonable, but like all rules of policy and law it should not be applied in only one direction.

The effect of pollution abatement expenses, pervasive inflation, increases in the cost of fuel, and similar problems which are plaguing public utilities must be considered risks to be borne by the rate payer. A market-sector enterprise

faced with similar problems would either increase its prices or go out of business; the latter option, however, is hardly a viable one for a public utility. A public utility, in fact, must constantly expand its business. Certainly no reasonable commission would tolerate a significant reduction in the *cost* of service unaccompanied by a significant reduction in rates. If, for example, Professor Bardine at the University of Illinois were to perfect super-conductivity technology by which electricity could be transmitted over long distances with almost zero resistance, and as a consequence the cost of maintaining an electric power distribution system dramatically fell, it is obvious that the Public Service Commission would require commensurate rate reductions. While public utilities must be insulated from losses beyond their control they are similarly insulated from any opportunity to make a profit in excess of "a fair rate of return," and this fact would explain a natural tendency of utility stock to move with the bond market. It does not explain, however, the tendency of utility stock not to move upwards at all.

On remand, therefore, an order and a supporting record if necessary should be developed which addresses the following issues: (1) what is a fair rate of return to a public utility and what is the methodology by which that rate of return is determined; (2) what business risks and opportunities for profit are appropriately allocated to the utility and what risks are appropriately allocated to the rate payer; (3) is the current method of setting a rate for this utility by using an adjusted test year a realistic system of rate regulation and, if not, what system will be realistic; and (4) what is the long-term effect of the actual current rate of return for the company with regard to its ability to meet its need for capital in the immediate future?

### D

There is one final issue which I feel compelled to address and that concerns the inclusion or noninclusion of construction works in progress (CWIP) in the rate base. The first chart on rate of return, *supra*, does not refine the degree to which CWIP has been included by the company in its calculation of the rate base. Certainly it would seem

logical that to the extent CWIP is devoted to pollution abatement, a project which uses rather than generates electricity, its immediate inclusion is in order as a cost not recoverable in future operation. In effect, the Commission has already recognized this fact and included some CWIP in the rate base in the case before us. Unfortunately the record in the case before us is not sufficiently refined for me to make any exact computations about the rate of return which would apply in the absence or inclusion of CWIP for profit generating equipment. The Commission's expert witness on rates of return projected the utility's rate of return substantially higher than the utility's figures but he was not cross examined and, therefore, the issue of what CWIP has been included in rate base has not been developed sufficiently for any further factual analysis on my part.

Ordinarily, a private, market-sector enterprise cannot expect to make a profit on money which is tied up in the construction of new plant and equipment before that plant and equipment is in operation. A market-sector firm, however, expects that the interim financing charges allocated to the construction of the new plant will be recovered through increased profits in the future. That, in fact, is the very nature of investment. There is no debate that the utility needs to construct new plants so that such construction cannot be considered a stupid investment. In general, when a company is investing intelligently the market value of the stock reflects a market expectation of larger profits in the future. Why then does the company's stock sell below book value? Obviously the market performance of this utility's stock confounds our expectations about how current investment aimed at future profits should affect the attractiveness of the stock. Obviously someone out there in stockholder land does not believe that the utility will *ever* be permitted to earn a fair return on its current CWIP investments, otherwise the stock would not be selling below book value. While stockholder land is not infallible in its conclusions, institutional investors are at least as sophisticated as the Harvard Business School, and that gives the stock market about as heavy a presumption of accuracy in those matters as the average jury.

The issue of CWIP recurs throughout major utility cases primarily because the inclusion or exclusion of that factor in the rate base can be manipulated by the company to give a very high current profit or by the Commission to give a very low one. In fact the rate payer under any fair set of regulations will either pay the cost of these projects today while they are being built or tomorrow when they are in service. Given the overall problems of the utilities in raising funds it is certainly worth exploring in the record the possibility of adopting a pay-as-we-go program which will enhance the overall profit picture of the utility at the present time and permit the issuance of bonds or preferred stock at a significantly reduced cost in the future.[3] Since the issue of the inclusion of construction works in progress in the rate base goes directly to the heart of the "fair rate of return" question, it is one of the few issues so inextricably intertwined with that issue as to be fit subject for exhaustive development below and reconsideration by this Court.

### III

I would conclude with a general observation about the development of these types of cases in the Commission. Obviously, in this time of intense struggle over income shares there is a significant possibility that business will be sacrificed because of its relative lack of votes in the political process and its attractiveness as a target for rhetorical attack. Thus, like everyone else in society the last refuge for business is the courts. Accordingly, the courts must review with ever greater frequency rate regulation cases and this implies that counsel below pay attention to making a record which can be understood by judges who are not experts.

The record before this Court contains thousands of pages of exhibits and submissions without cross examination which I, for one, cannot understand. I do not doubt that the Commission can understand them because that is what public service commissions are all about. The lack of

---

[3] For a recent discussion of this issue see Commissioner Elwin Bresette's dissent in case No. 80-058-E-42T, a consideration of rate increase for Monongahela Power Company, filed January 14, 1981.

cogency of this opinion emanates from the lack of cogency of the record before me. I have the nagging feeling that lawyers arguing rate regulation cases in this Court proceed on the principle that if you can't dazzle the Court with brilliance, you can at least baffle them with nonsense. I don't like that feeling because it makes me think that I am stupid.

In the future I shall take it very ill if thousands of pages of repetitive testimony are placed in a record when one cogent witness, intelligently cross examined, would suffice. It should be remembered that the term "weight of the evidence" does not imply measurement in pounds. Futhermore, it is in the interest of both Commission and utility to designate a record, print it separately in one comprehensible volume with pagination which the country average judge can follow, and narrow the issues to things which a court can understand. Often the party which thinks that it will prevail by sheer weight of nonsense is enormously uncooperative about designation and narrowing of issues; this is both ungentlemanly and, at least in my chambers, will cause an enormous amount of conscious bad will towards those who deliberately attempt to confuse issues. When either party has just reason to believe that the other is uncooperative in this regard, efforts to make a manageable record should be made a part of the record themselves so that the Court can impose sanctions on the recalcitrant, obstreperous, or inconsiderate.

It is also a misconception to believe that this Court, which is an organized, collective intelligence composed of a range of talent which exceeds as an entity the talent limitations on the judges alone, cannot understand the methodology of economics, including the underlying calculus and statistics. Rate regulation is enormously taxing intellectually and in this one area it appears to me essential that the lawyers trying the case have some formal training in mathematics, statistics, and economics. While I consistently point out that a court is not competent to understand nit-picking accounting conventions or other points of traditional haggling between commissions and utilities, we can understand rate of return. In that regard we can understand everything about rate of return; the statistical

method used to determine the rate base; the econometrics of models simulating rates of return to comparable market sector enterprises; and all of the movements in the capital market which bear upon a utility's ability to raise funds. Consequently, these issues should be developed with some precision. Legal skills are important in developing cases of this type, but counsel capable of skillful development of expert testimony is even more important and that is not a legal skill, but rather the result of understanding on the part of the lawyer of the expert's field. Rate regulation cases are not competitions between lawyers to see who can insert the greater volume of junk which they do not understand themselves in the record. If the lawyer asking the questions doesn't know the answer to the questions being asked and understand the methodology from some background of formal training, he will hardly be able to organize or illuminate the record. If in future appeals in this Court a lawyer arguing the case for either side cannot explain one piece of evidence in the record I shall leave. It is no excuse for appellate counsel to argue that he "didn't try the case below." When garbage goes into a case garbage comes out!